1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JEREMY SHAWN SUTHERLAND,

11              Petitioner,              No. CIV S-05-0532 MCE DAD P

12        vs.

13   JEANNE S. WOODFORD,

14              Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding through counsel with a petition for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

18   entered against him on April 5, 2002 in the Shasta County Superior Court for second degree

19   murder in violation of California Penal Code § 187(a).  He seeks relief on the grounds that: (1)

20   the admission into evidence at his trial of the statements of a non-testifying accomplice violated

21   his rights to due process and to confront the witnesses against him; (2) the admission into

22   evidence of his statements to his friends over the telephone violated his right to due process

23   because the evidence resulted from the use of coercive interrogation tactics; (3) jury instruction

24   error violated his right to due process (claims 3, 4, 5, 6, 7); (4) the prosecutor committed

25   misconduct; and (5) the California Court of Appeal improperly refused to address meritorious

26   appellate arguments, in violation of his right to due process and appellate review.  Upon careful

1    consideration of the record and the applicable law, the undersigned will recommend that

2    petitioner's application for habeas corpus relief be denied.

3                              PROCEDURAL AND FACTUAL BACKGROUND[1]

4                The evidence, viewed in a light most favorable to the judgment
                 (People v. Carpenter (1997) 15 Cal.4th 312, 387, 63 Cal.Rptr.2d 1,
5                935 P.2d 708), reflects the following:

6                The victim, Thomas Sparks, was a registered sex offender who had
                 spent some time in state prison, apparently on a conviction related
7                to child molestation, and who purportedly was involved in
                 methamphetamine transactions.

8
                 Sparks was acquainted with Kimberly Raible, who was aware he
9                had been in prison but did not know the nature of his conviction.
                 She assumed it had to do with methamphetamine.
10
                 On the evening of January 20, 2001, Raible was staying at the
11               home of Michael Wayne Griffith.  Sparks called, told Raible that
                 he was in the area, and said he wanted to visit her at her home.
12               Raible replied that Sparks would have to come to Griffith's house
                 to see her.
13
                 That same night, defendant and his friend, James Shane Taylor,
14               had met Sparks at the home of a mutual acquaintance.  Sparks
                 asked them for a ride to Raible's house and offered to give them
15               methamphetamine in return.  Defendant and Taylor took Sparks to
                 Raible's home and then went to Griffith's house.  They told Raible
16               that they had left Sparks at her house and that they were there to
                 take her home.
17
                 At this point, Carla Cline, who was a long-time friend of Raible's,
18               told her that Sparks was a child molester.  Raible became very
                 upset, and defendant called Sparks's former mother-in-law for
19               confirmation.  When the news was confirmed, Raible said she did
                 not want Sparks in her home.  Defendant and Taylor stated they
20

21               ───────────────────
                      [1]  The following summary is drawn from the December 16, 2003 opinion by the
22               California Court of Appeal for the Third Appellate District, petitioner's lodged document entitled
                 "December 16, 2003, Affirmation of Petitioner's Conviction" (hereinafter Opinion), at pgs 1-4.
23               This court presumes that the state court's findings of fact are correct unless petitioner rebuts that
                 presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Woodford,
24               384 F.3d 628, 638 (9th Cir. 2004).  "Clear and convincing evidence" within the meaning of §
                 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an
25               abiding conviction" that the factual contentions being advanced are "highly probable."  Cooper v.
                 Brown, 510 F.3d 870, 919 (9th Cir. 2007) (quoting Sophanthavong v. Palmateer, 378 F.3d 859,
26               866 (9th Cir. 2004)).  Petitioner has not attempted to overcome the presumption with respect to
                 the underlying events.  The court will therefore rely on the state court's recitation of the facts.

                                            2

would go and get him out of the house. Defendant said they would need "a pipe or something." Defendant, Taylor, and Cline then left in defendant's mother's car, which defendant was driving that night. They took with them a pipe wrench that Griffith had on his front porch.

When they arrived at Raible's house, Cline took a plate into the bedroom and began preparing lines of methamphetamine. After Sparks entered the bedroom and sat next to Cline on the bed, defendant and Taylor rushed in and attacked him. They beat Sparks with their fists and hit him on both sides of the head with a blunt instrument with sufficient force to knock holes in his skull. The attack ended when Cline said Sparks had had enough. The group left him on the bed and took defendant's mother's car back to her house, where they left it. Eventually, they made their way back to Griffith's house.

Thereafter, defendant and Taylor left Griffith's house and went to where Darlene Deptuch was staying. Deptuch knew Taylor but did not consider him a friend. Taylor told her that they needed to borrow her car, a green Ford Explorer, and said they would give her $60 for its use. Deptuch did not want to let them take her car but felt she had no choice in the matter.

Deptuch testified that she had cleaned the car inside and outside the day before. But when defendant and Taylor returned it, the car was a mess. There was soda sprayed all over, there were cigarettes and splinters in the car, there was mud all over the outside, and the car had a foul smell that she could not identify.

It is apparent that defendant and Taylor used Deptuch's car to dispose of Sparks's body. The body was discovered about a week later in a remote area of the county. It had been pushed down a steep incline where Taylor's brother, a rancher, occasionally had disposed of dead sheep. Blankets and other bedding materials that had been taken from Raible's house, including a sleeping bag, were left near the body. Correspondence left with the bedding materials led investigators to Raible's house. There they discovered that Raible's mattress had been turned over and that the underside was saturated with the victim's blood.

Cline entered into a plea agreement pursuant to which she pled guilty to voluntary manslaughter with a maximum sentence of 11 years and agreed to testify at trial.

Taylor entered into an agreement to dispose of this case, as well as a number of unrelated charges pending against him. He pled no contest to voluntary manslaughter in this case, and to a number of other charges, in return for a stipulated sentence of 21 years. Taylor's plea agreement did not require him to testify at trial, and he invoked the right not to testify.

1
2
Defendant was found guilty of second degree murder. We will note other aspects of the evidence as necessary in connection with our discussion of the issues presented.

3
ANALYSIS

4
I. Standards of Review Applicable to Habeas Corpus Claims

5
6
7
8
9
10
11
12
A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

13
14
15
16
This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

17
18
19
An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

20
21
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

22
23
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

24
25
26
See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

1  of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

2  also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

3  we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

4  error, we must decide the habeas petition by considering de novo the constitutional issues

5  raised.").

6          The court looks to the last reasoned state court decision as the basis for the state

7  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

8  state court decision adopts or substantially incorporates the reasoning from a previous state court

9  decision, this court may consider both decisions to ascertain the reasoning of the last decision.

10 Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

11 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

12 habeas court independently reviews the record to determine whether habeas corpus relief is

13 available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle

14 v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not

15 reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

16 AEDPA's deferential standard does not apply and a federal habeas court must review the claim

17 de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

18 II.  Petitioner's Claims

19      A.  Admission of Hearsay Statements of Non-Testifying Accomplice

20          Petitioner's first claim is that the admission into evidence at his trial of the

21 hearsay statements of James Taylor, a non-testifying accomplice, violated his rights to due

22 process and to confront the witnesses against him and that the hearsay statements were

23 inadmissible under California law.  (Pet. at 6-14.)  Petitioner raised these claims on appeal and in

24 a petition for review filed with the California Supreme Court.  (Pet'r's Lodged Docs. entitled

25 "Appellant's Opening Brief Dated March 28, 2003" and "January 16, 2004 Petition fore [sic]

26 Review in the California Supreme Court").

1. <u>State Court Opinion</u>

The California Court of Appeal described the background to petitioner's due process and Confrontation Clause claims and its ruling thereon as follows:

> Defendant contends the trial court erred in allowing the prosecutor to introduce the extrajudicial statements made by James Taylor, who was one of the participants in the homicide.

> Tara Burbank was Taylor's former girlfriend.  They have a child together who, at the time of trial, was six years old.  While the investigation of Sparks's death was continuing in late February or early March 2001, Taylor called and asked Burbank to meet him to discuss some matters.  When she did so, Taylor told her that he was under investigation for murder and that other people were involved.  He would not identify the others but did say one was then in the county jail and the other was at High Desert prison.  He added that one was a sister, meaning a woman.  He said that it was a "white pride thing" and that they were called on to take care of a man who had molested a niece or granddaughter of someone with whom they had been hanging out.  He said the others could not finish the job so they looked to him to do so.

> About a week later, Taylor arranged to meet Burbank again.  He told her the police were on to him and he would be moving a couple of states away.  Burbank became angry and asked what she was supposed to tell their son.  Taylor said she could tell him that his daddy went to jail for killing a child molester.

> Taylor exercised the Fifth Amendment right not to testify.  Over defense objection, his statements to Burbank were admitted as declarations against penal interest pursuant to Evidence Code section 1230.

> Defendant contends the statements were not admissible under Evidence Code section 1230, were admitted in violation of his right to confront and cross-examine witnesses, violated principles of due process, and should have been excluded pursuant to Evidence Code section 352.

> Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

6

Where, as here, the prosecution offers a hearsay declaration against a criminal defendant on the basis that the statement was against the declarant's penal interest, the prosecution must establish that (1) the declarant is unavailable, (2) the statement was against his penal interest when made, and (3) the declaration was sufficiently reliable to warrant admission despite its hearsay character.  (People v. Lucas (1995) 12 Cal.4th 415, 462, 48 Cal.Rptr.2d 525, 907 P.2d 373.)  Since Taylor exercised his Fifth Amendment right not to testify, he was unavailable as a witness.  (People v. Duarte (2000) 24 Cal.4th 603, 609, 101 Cal.Rptr.2d 2d 701, 12 P.3d 1110.)  Accordingly, we must focus upon whether the statements were against Taylor's penal interest and were otherwise sufficiently reliable to warrant admission.

The fact that an out-of-court statement might be facially inculpatory is not in itself sufficient to support its introduction into evidence as a statement against penal interest.  (People v. Duarte, supra, 24 Cal.4th at pp. 611-612, 101 Cal.Rptr.2d 701, 12 P.3d 1110.)  When accused of criminal behavior, suspects often will attempt to shift blame or curry favor.  (Id. at p. 612, 101 Cal.Rptr.2d 701, 12 P.3d 1110.)  They may admit some complicity while minimizing their roles and attempting to place major responsibility on others.  (Ibid.)  A statement that appears inculpatory may, when considered in context, also be exculpatory or have a net exculpatory effect.  (Ibid.)  Accordingly, such statements must be viewed in context and, in order to be admissible under Evidence Code section 1230, they must appear "'specifically disserving'" to the declarant's penal interests. (Ibid.)

In defendant's view, Taylor's statements to Burbank were not sufficiently disserving to be admissible under Evidence Code section 1230.  We disagree.

Taylor admitted participating in a murder. Although he said others were involved, he did not minimize his own participation or attempt to shift primary blame to them.  If anything, his statement that he was called upon to finish the murder when the others could not suggests he was the more deadly or cold-blooded of the killers. His statement that it was a "white pride thing" and he was called on by another person to take the victim out would only serve to make the killing more serious by tending to show premeditation and deliberation.  (Pen. Code, § 189.)  His statement that the victim was a child molester would in no way tend to exonerate Taylor, and there is nothing in the record to suggest that he believed otherwise.

We also take note of the circumstances under which the statements were made.  Specifically, they were not made after an arrest or otherwise in the coercive atmosphere of an official interrogation. (People v. Duarte, supra, 24 Cal.4th at p. 617, 101 Cal.Rptr.2d 701, 12 P.3d 1110.)  Indeed, they were not made in the face of an

accusation at all.  Taylor voluntarily arranged to meet Burbank so he could explain to her why he was laying low and then planned to leave the state.  The usual motive to curry favor by implicating others or to shift blame in the hope of leniency did not exist in this case.  This is relevant both in placing the statements in context and in determining whether they are otherwise sufficiently reliable to warrant their introduction into evidence.  (Id. at pp. 612, 617, 101 Cal.Rptr.2d 701, 12 P.3d 1110.)  When we consider the statements on their face and in light of the circumstances in which they were made, we conclude the trial court did not err in finding them admissible under Evidence Code section 1230.

Defendant contends, however, that introduction of Taylor's statements violated defendant's constitutional right to confront witnesses.  In this respect, he relies upon the decision of the United States Supreme Court in Lilly v. Virginia (1999) 527 U.S. 116 [144 L.Ed.2d 117] (hereafter Lilly ).  The conclusions made in Lilly present a mixed bag.  In the circumstances of this case, Lilly does not support defendant's contention.

In Lilly, it appeared that three men entered into a crime spree during which they committed a burglary, several robberies, a carjacking, and a murder.  Upon their apprehension, one of the culprits, Mark Lilly, made a confession in which he admitted being present and having some limited participation in some of the crimes.  However, he described his participation in most of the crimes as a mere drunken presence and said that the others, in particular his brother, Benjamin Lilly, instigated and carried out the crimes.  The statements were admitted into evidence in the trial of Benjamin as statements against the penal interest of Mark.  The Supreme Court of the State of Virginia upheld the admission of the evidence.

On review by certiorari, all of the justices agreed that the judgment had to be reversed and remanded to the state court.  But they expressed differing viewpoints on the matter.  A lead opinion expressed the views of six justices as to the result, but of only four justices as to its reasoning.  (Lilly, supra, 527 U.S. at p. 120, 119 S.Ct. at p. ___ [144 L.Ed.2d at p. 124].)  The four justices noted that the introduction of hearsay evidence does not offend the Confrontation Clause when the evidence falls within a firmly rooted exception to the hearsay rule or contains particularized guarantees of trustworthiness such that adversarial testing would add little, if anything, to reliability.  (Id. at pp. 124-125 [527 U.S. at p. ___, 119 S.Ct. at p. ___144 L.Ed.2d at p. 127].)  Those justices concluded that a confession of an accomplice that incriminates a criminal defendant does not fall within a firmly rooted exception to the hearsay rule.  (Id. at p. 134 [527 U.S. at p. ___, 119 S.Ct. at p. ___144 L.Ed.2d at p. 133].)  Then, relying heavily on the facts that the statements were the product of custodial interrogation and that they primarily sought to shift the

blame to others, the four justices concluded the statements lacked sufficient guarantees of trustworthiness.  (Id. at pp. 138-139 [527 U.S. at pp. ___, 119 S.Ct. at pp. ___,144 L.Ed.2d at pp. 135-136].)

Two justices concurred in the result, but expressed the view that the Confrontation Clause applies only to witnesses who testify at trial and to government – generated extrajudicial statements for use at trial, i.e., "'formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'"  (Lilly, supra, 527 U.S. at p. 143, 119 S.Ct. at p. ___ [144 L.Ed.2d at p. 138] (conc. opn. of Scalia, J.) and at pp. 143-144 [527 U.S. at pp. ___, 119 S.Ct. at pp. ___, 144 L.Ed.2d at pp. 138-139] (conc. opn. of Thomas, J.).)  Since the statements at issue clearly fell within that group, those justices concurred in the judgment.  (Ibid.)

The remaining three justices also concurred in the judgment. (Lilly, supra, 527 U.S. at p. 144, 119 S.Ct. at p. ___ [144 L.Ed.2d at p. 139] (conc. opn. of Rehnquist, C.J.).)  However, they noted the statements of Mark that were against his penal interest were quite separate in time and place from the statements that exculpated Mark and incriminated Benjamin.  (Id. at pp. 144-145 [527 U.S. at p. ___, 119 S.Ct. at p. ___,144 L.Ed.2d at p. 139].)  Concluding the statements of Mark that inculpated Benjamin were not in the least against Mark's penal interest, those justices saw no reason to go further and preclude consideration of custodial statements that equally inculpate both the declarant and the defendant.  (Id. at p. 146 [527 U.S. at p. ___, 119 S.Ct. at p. ___, 144 L.Ed.2d at p. 140].) Moreover, they noted that the statements at issue were part of a custodial confession of the sort the court views with "'special suspicion'" due to the accomplice's strong motivation to exonerate himself by implicating another.  (Ibid.)  The justices said the Supreme Court had previously recognized that statements which are not government–generated, such as statements to fellow prisoners and confessions to family members or friends, bear sufficient indicia of reliability to be placed before a jury without confrontation of the declarant, and saw no reason to foreclose the possibility that such statements may fall under a firmly rooted hearsay exception. (Id. at p. 147 [527 U.S. at p. ___, 119 S.Ct. at p. ___, 144 L.Ed.2d at p. 141].)  Accordingly, those justices chose to limit the holding to the facts at issue, i.e., a custodial confession laying sole responsibility upon another person.  (Id. at p. 148 [527 U.S. at p. ___, 119 S.Ct. at p. ___, 144 L.Ed.2d at p. 141].)

Here, we are concerned with extrajudicial statements in which the government played no part.  Taylor voluntarily arranged to meet his former girlfriend – the mother of his child – in order to tell her why he was laying low and then planning to leave the state. Moreover, in his statements Taylor did not lay sole responsibility on defendant, nor did he attempt to shift primary blame to him. When we read all of the opinions in Lilly and count the justices, it

is apparent that a majority of the justices agreed the decision has no application to these facts.

This is not to say extrajudicial statements that are not government–generated do not implicate the Confrontation Clause. That was a view expressed by only two of the justices in Lilly.  It appears likely from the four– justice lead opinion and the three–justice concurring opinion that a majority of the justices would agree that the admission of statements which do not actually meet the criteria for introduction as statements against interest would violate the right to confrontation regardless of whether they are government-generated.  However, our state Supreme Court has laid down a strict test for the introduction of statements against penal interest.  Such statements must be "'specifically disserving'" to the declarant's penal interests and must, in light of the surrounding circumstances, bear sufficient indicia of trustworthiness to warrant being introduced into evidence."  People v. Duarte, supra, 24 Cal.4th at pp. 612, 614, 101 Cal.Rptr.2d 701, 12 P.3d 1110.)  From our reading of the opinions in Lilly, we are satisfied that, at least with respect to statements which are not government–generated, the introduction of statements that meet this test does not violate the Confrontation Clause.

Defendant asserts that introduction of the hearsay statements violated principles of due process.  "[T]he state has power to regulate the procedures under which its laws are carried out, and a rule of evidence in this regard 'is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  [Citations.]'"  (People v. Fitch (1997) 55 Cal.App.4th 172, 178-179, 63 Cal.Rptr.2d 753.)  The specific guarantees included in the Bill of Rights are fundamental principles but, beyond those guarantees, the due process clause has limited operation.  (Id. at p. 179, 63 Cal.Rptr.2d 753.)  Accordingly, "[o]ne raising a due process claim to exclude relevant evidence must sustain a heavy burden." (Ibid.)

Defendant does not develop his due process argument beyond asserting that the evidence was unreliable.  The ultimate determination whether evidence is reliable is for the trier of fact.  To be admissible before the trier of fact as a statement against penal interest, hearsay evidence must meet a threshold of trustworthiness.  (People v. Duarte, supra, 24 Cal.4th at p. 614, 101 Cal.Rptr.2d 701, 12 P.3d 1110 .)  Where, as here, challenged evidence meets the required threshold of trustworthiness, due process is satisfied.

Defendant contends the evidence should have been excluded as unduly prejudicial pursuant to Evidence Code section 352, which gives a trial court the discretion to exclude otherwise admissible

evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  The decision whether to exclude otherwise admissible evidence is committed to the broad discretion of the trial court and cannot be disturbed on appeal absent a clear abuse thereof.  (People v. Scheid (1997) 16 Cal.4th 1, 19, 65 Cal.Rptr.2d 348, 939 P.2d 748.)

In his statements to Burbank, Taylor did not specifically implicate defendant in the murder.  He told her that he would not identify the other participants because he did not want her involved.  However, when considered with the other evidence at trial, the evidence had substantial probative value.  In two interviews with investigators, defendant claimed to have been with Taylor throughout the relevant period.  Numerous witnesses placed them together before the murder, after the murder but before disposal of the body, and after disposal of the body.  Following his second interview, while defendant was in jail on an unrelated charge, he made monitored telephone calls in which he urged his friends to relay his version of the events to Taylor, to tell Taylor not to say anything to the police, and to tell him to demand a lawyer because they could not talk to him if he demanded a lawyer.  In light of this evidence, Taylor's admission that he was involved in the murder tended to establish that defendant also was involved.

Defendant argues Taylor's statement that there was a connection between the murder and a "white pride thing" was prejudicial because it suggested a gang affiliation.  Evidence of gang membership can be relevant in a murder trial for a variety of reasons, such as proof of motive.  (People v. Maestas (1993) 20 Cal.App.4th 1482, 1497, 25 Cal.Rptr.2d 644.)  But where such evidence has no relevance to the issues, it is inadmissible and may present a danger of undue prejudice.  (Id. at pp. 1497-1498, 25 Cal.Rptr.2d 644.)

Taylor's statements indicated there was a white pride motive to the murder and were thus facially relevant.  But the white pride issue was otherwise undeveloped in the evidence, and the prosecutor did not contend there was a white pride motive for the murder.[2]  In view of the prosecutor's theory and the other evidence in the case, we agree that the white pride statements were not themselves relevant.

---

[2]  The prosecutor theorized that defendant and Taylor were inclined to rob Sparks for the drugs and money they believed him to have.  The news that Sparks was a child molester and Raible's statement that she wanted him out of her house served to solidify the thought of beating and robbing Sparks because they believed that no one would care what happened to a child molester. The prosecutor made no effort to suggest that they acted at the request or direction of a white pride person.

However, defendant did not object in the trial court on this ground. He sought to preclude Burbank's testimony in its entirety. When defendant's objections based on Evidence Code section 1230 and confrontation grounds were overruled, he interposed an objection pursuant to Evidence Code section 352 saying: "Basically, it's statements that don't really contain a lot other than putting the defendant at the location and suggesting that at least some of the party had a significant involvement in it."

In order to preserve for appeal an objection to introduction of evidence, a party must object in the trial court, state the specific grounds of objection, and specify the particular evidence that he wishes to exclude. (People v. Harris (1978) 85 Cal.App.3d 954, 957, 149 Cal.Rptr. 860.) When evidence is in part admissible and in part inadmissible, the inadmissible portion cannot be reached by an objection to the evidence in its entirety; rather, the inadmissible portion must be specified. (Ibid.) By failing to specifically object to the white pride aspect of the evidence, or to make an argument based thereon, defendant deprived the trial court of the opportunity to consider excluding that portion of the evidence. (People v. Morris (1991) 53 Cal.3d 152, 196, 279 Cal.Rptr. 720, 807 P.2d 949, disapproved on another ground in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.) Thus, objection to that portion of the evidence was waived. (Ibid.)

To the extent that defendant argues the white pride aspect of the evidence should have required exclusion of Burbank's testimony in its entirety, we reject the contention. In light of the other evidence, Taylor's statements to Burbank had substantial probative value. The potential for prejudice from the brief white pride references did not so clearly outweigh the probative value of the evidence that we could find an abuse of the trial court's discretion in refusing to exclude the evidence in its entirety.

(Opinion at 4-15.)

       2.  Applicable Legal Standards

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI.  This right, extended to the States by the Fourteenth Amendment, includes the right to cross-examine witnesses.  Cruz v. New York, 481 U.S. 186,

/////

/////

/////

189 (1987) (citing <u>Pointer v. Texas</u>, 380 U.S. 400, 404 (1965)).[3]  "The central concern of the

Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by

subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."

<u>Lilly v. Virginia</u>, 527 U.S. 116, 124 (1999) (quoting <u>Maryland v. Craig</u>, 497 U.S. 836, 845

(1990)).  <u>See</u> <u>also</u> <u>Davis v Alaska</u>, 415 U.S. 308, 315 (1974) (a primary interest secured by the

Confrontation Clause is the right of cross-examination).  At the time of petitioner's trial, federal

law provided that an unavailable witness's out-of-court statement could be admitted against a

criminal defendant and not run afoul of the Confrontation Clause so long as it bore adequate

indicia of reliability – i.e., fell within a "firmly rooted hearsay exception" or otherwise bore

"particularized guarantees of trustworthiness" such that adversarial testing would be expected to

add little, if anything, to the statement's reliability.  <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980);

<u>Lilly</u>, 527 U.S. at 124-25.

        Shortly after petitioner's trial was concluded, the United States Supreme Court

held that the Confrontation Clause bars the state from introducing into evidence out-of-court

statements which are "testimonial" in nature unless the witness is unavailable and the defendant

had a prior opportunity to cross-examine the witness, regardless of whether such statements are

deemed reliable.  After the petition and traverse were filed in this matter, the United States

Supreme Court announced that the holding in <u>Crawford</u> does not apply retroactively to

convictions that became final before <u>Crawford</u> was decided.  <u>Whorton v. Bockting</u>, 549 U.S. 406,

421 (2007).  <u>Crawford</u> was decided nine days prior to the denial of petitioner's petition for

review by the California Supreme Court.  However, "[a] state conviction and sentence become

final for purposes of retroactivity analysis when the availability of direct appeal to the state courts

has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a

_____

        [3]  A witness is considered to be a witness "against" a defendant for purposes of the
Confrontation Clause if his testimony "is part of the body of evidence that the jury may consider
in assessing his guilt."  <u>Cruz v. New York</u>, 481 U.S. 186, 190 (1987).

1  timely filed petition has been finally denied." Caspari v. Bohlen, 510 U.S. 383, 390 (1994).

2  Under this definition, petitioner's conviction had not yet become final at the time of the

3  Crawford decision.  Accordingly, the holding in Crawford is applicable to petitioner's

4  Confrontation Clause claim before this court.

5          3.  Analysis

6              a.  Confrontation Clause

7              Petitioner was not able to cross-examine Taylor at trial regarding his statements to

8  Burbank because Taylor invoked his Fifth Amendment privilege not to testify and was therefore

9  rendered "unavailable."  See California v. Green, 399 U.S. 149, 168 n.17 (1970) (a witness who

10  properly invokes the Fifth Amendment privilege is not available for cross-examination);

11  Whelchel v. Washington, 232 F.3d 1197, 1204 (9th Cir. 2000) (same).  Petitioner was also

12  unable to cross-examine Taylor at the time he made the out-of-court statements to Burbank.

13  Accordingly, if Taylor's statements were "testimonial in nature," petitioner is entitled to relief on

14  his Confrontation Clause claim.  Crawford, 541 U.S. at 68.

15              "The Supreme Court has yet to define the extent to which rights under the

16  Confrontation Clause are applied to testimonial and nontestimonial statements."  United States v.

17  Norwood, 555 F.3d 1061, 1065 -1066 (9th Cir. 2009).  In this regard, in Crawford the Supreme

18  Court declined "to spell out a comprehensive definition of 'testimonial.'"  541 U.S. at 68 & n.10.

19  However, the court did describe three "formulations of [the] core class of testimonial

20  statements."  Id. at 51-52.  The first formulation was described as "ex parte in-court testimony or

21  its functional equivalent – that is, material such as affidavits, custodial examinations, prior

22  testimony that the defendant was unable to cross-examine or similar pretrial statements that

23  declarants would reasonably expect to be used prosecutorially."  Id. at 51.  The second

24  formulation was described as "extrajudicial statements . . . contained in formalized testimonial

25  materials, such as affidavits, depositions, prior testimony, or confessions."  Id. at 51-52 (quoting

26  White v. Illinois, 502 U.S. 346, 365  (1992)).  The third formulation described statements that

were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52.  The court noted that "[w]hatever else the term [testimonial] covers, it applies . . . to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations." Id. at 68.  With regard to statements that are not testimonial, the Supreme Court stated that "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay laws . . . as would an approach that exempted such [nontestimonial] statements from Confrontation Clause scrutiny altogether." Id.

In Davis v. Washington, 547 U.S. 813, 821-33 (2006), a case involving a call during an ongoing emergency to a 911 operator (deemed a police agent) the United States Supreme Court elaborated on the holding in Crawford, exploring the parameters of statements which were "testimonial" in nature.  The court noted that only "testimonial" statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." Id. at 821.  The court in Davis, however, declined to address "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" Id. at 823 n.2.

The Ninth Circuit has concluded that statements contained in the diary of petitioner's wife were not testimonial because the diary was not created "under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial." Parle v. Runnels, 387 F.3d 1030, 1037 (9th Cir. 2004).  In Horton v. Allen, 370 F.3d 75, 83 (1st Cir. 2004), the First Circuit determined that the petitioner's statements to an acquaintance were not testimonial in nature because they were not made to law enforcement personnel and were not given under circumstances in which an objective person would reasonably believe that the statements would be available for use at a later trial. Id. at 85. Finally, the Eighth Circuit has held that the Confrontation Clause did not bar the use at defendant's trial of statements made to third parties because the statements "were made to loved /////

1    ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of

2    which <u>Crawford</u> speaks." <u>United States v. Manfre</u>, 368 F.3d 832, 838 (8th Cir. 2004).

3              After comparing the circumstances of this case to those presented in the cases

4    cited above, this court concludes that Taylor's statements to Burbank were not testimonial in

5    nature.  There is no evidence in the record suggesting that Taylor made the statements for the

6    purpose of supplying evidence to the prosecution.  Rather, the conversation was between two

7    private individuals, without any active participation by a government official.  Further, as noted

8    by the state appellate court, in his statement to the mother of his child, Taylor made no effort to

9    minimize his own guilt or to shift the blame.  The statements were not contained in formalized

10   documents such as affidavits, depositions, or prior testimony transcripts, and were not made as

11   part of a confession resulting from custodial examination.  Nor were Taylor's statements made

12   under circumstances in which an objective person would "reasonably believe that the statement

13   would be available for use at a later trial." <u>Crawford</u>, 541 U.S. at 52.  Because Taylor's

14   statements were non-testimonial in nature, the Confrontation Clause did not prevent their

15   admission at petitioner's trial.  <u>See</u> <u>Norwood</u>, 555 F.3d at 1066 (noting that the Ninth Circuit has

16   "interpreted the Supreme Court's ruling in <u>Crawford</u> to allow the admission of nontestimonial

17   statements without scrutiny under the Confrontation Clause").[4]

18             Even when analyzed under the prior <u>Roberts</u> test, the admission into evidence of

19   Taylor's statements did not violate the Confrontation Clause.  As noted above, at the time of

20   petitioner's trial, <u>Roberts</u> and <u>Idaho v. Wright</u>, 497 U.S. 805, 819 (1990) governed the

21   admissibility of hearsay evidence in a criminal case for purposes of the Confrontation Clause.

22   Under the holdings in those cases, Taylor's statements to Burbank were admissible only if they

23

24            [4]  Petitioner argues that Taylor's guilty plea, which was "tied to his admissions to . . .
25   Burbank," was a prior "testimonial statement" which rendered Taylor's statements to Burbank
     inadmissible at his trial.  (Traverse at 4-6.)  The court rejects that argument.  The relevant
26   testimonial statements for purposes of Confrontation Clause analysis are Taylor's statements to
     Burbank, not Taylor's guilty plea.

1  bore "adequate indicia of reliability" – that is, if the statements fell within a "firmly rooted

2  hearsay exception" or contained "particularized guarantees of trustworthiness."  Roberts, 448

3  U.S. at 66; Wright, 497 U.S. at 815-16.

4          Accomplice confessions that incriminate a criminal defendant are not deemed to

5  fall within a firmly rooted exception to the hearsay rule.  Lilly, 527 U.S. at 134.  Therefore,

6  incriminating statements by a non-testifying co-defendant may be admitted against another

7  defendant only if they satisfy the "particularized guarantees of trustworthiness" prong of Roberts.

8  Lilly, 527 U.S. at 134-37.  See also Lee v. Illinois, 476 U.S. 530, 543 (1986); Forn v. Hornung,

9  343 F.3d 990, 996-97 (9th Cir. 2003).  Whether a statement bears "particularized guarantees of

10  trustworthiness" must be shown from the totality of the circumstances surrounding the making of

11  the statement, not from the trial evidence as a whole.  Wright, 497 U.S. at 819.  The "relevant

12  circumstances include only those that surround the making of the statement and that render the

13  declarant particularly worthy of belief."  Id.

14          After a thorough analysis of relevant United States Supreme Court authority, the

15  California Court of Appeal reasonably concluded that Taylor's statements to Burbank bore

16  sufficient indicia of trustworthiness to be admissible at petitioner's trial.  As noted by the state

17  court, at the time Taylor made the statements he had not been accused of any crime.  Therefore,

18  his statements were not made after an arrest or during an official interrogation of any kind.

19  Further, Taylor met with Burbank for the purpose of explaining his intended absence to her and

20  to their son.  He did not make the statements in order to "curry favor by implicating others or to

21  shift blame in the hope of leniency."  (Opinion at 8.)  Contrary to petitioner's arguments, Taylor

22  did not attempt to shift blame for the killing to petitioner; indeed, he did not mention any other

23  person by name and he identified himself as the actual killer.  This court agrees with the state

24  trial court's observation  that "there isn't really any – much in terms of shifting responsibility"

25  contained in Taylor's statements.  (RT at 664.)  Further, Taylor had nothing to gain by describing

26  the circumstances of the crime to Burbank.  Indeed, he was reportedly shaking, crying, and scared

17

1   at the time he made the statements.  (Id. at 684.)   Under these circumstances, Taylor's statements

2   were so apparently truthful that cross-examination would have been of only marginal utility.

3   Because Taylor's statements to Burbank bore sufficient indicia of trustworthiness, petitioner's

4   rights under the Confrontation Clause were not violated by their admission into evidence at his

5   trial.

6           For all of the foregoing reasons, the conclusion of the California Court of Appeal

7   that petitioner's rights under the Confrontation Clause were not violated by the admission into

8   evidence of Taylor's statements to Burbank is not contrary to or an unreasonable application of

9   federal law.  Accordingly, petitioner is not entitled to relief on this claim.

10              b. Due Process

11          Relying on the decision in White v. Illinois, 502 U.S. at 363-64, petitioner next

12  argues that the admission into evidence of Taylor's statements to Burbank violated his right to

13  due process.  (Pet. at 12-13.)  He contends that "the use of blame-shifting accomplice hearsay

14  poses substantial reliability problems."  (Id. at 12.)  In White, the United States Supreme Court

15  opined that the introduction into evidence of unreliable hearsay evidence is more amenable to

16  analysis under the Due Process Clause rather than the Confrontation Clause.  502 U.S. at 363-64

17  (Thomas, J., concurring).

18          The California Court of Appeal concluded that the introduction of Taylor's

19  statements into evidence did not violate petitioner's due process right to a fair trial because they

20  met a sufficient threshold of trustworthiness and did not "offend[] some principle of justice so

21  rooted in the traditions and conscience of our people as to be ranked as fundamental."  (Opinion

22  at 12.)  A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief

23  on due process grounds only if it "is so unduly prejudicial that it renders the trial fundamentally

24  unfair," Payne v. Tennessee, 501 U.S. 808, 825 (1991), and "violates those fundamental

25  conceptions of justice which lie at the base of our civil and political institutions, and which

26  /////

1   define the community's sense of fair play and decency."  Dowling v. United States, 493 U.S. 342,

2   353 (1990).

3            This court agrees with the conclusion of the California Court of Appeal that the

4   admission into evidence of Taylor's statements to Burbank did not constitute a due process

5   violation.  For the reasons explained above, the statements carried sufficient indicia of

6   trustworthiness so that their admission into evidence at petitioner's trial did not render the

7   proceedings fundamentally unfair.  Accordingly, petitioner is not entitled to relief on his due

8   process claim.

9            c.  "White Pride" Comment

10           Petitioner also claims that Taylor's statement to the effect that the killing was a

11  "white pride thing" were unduly inflammatory and prejudicial.  (Pet. at 14.)  He argues that this

12  statement "injected an unnecessary and inflammatory mention of White Pride gangs into this

13  case" and should have been excluded from evidence at his trial.  (Id.)  The California Court of

14  Appeal agreed that this "white pride" evidence was irrelevant to the issues raised by petitioner's

15  trial, especially in light of the fact that the prosecutor did not contend there was a white pride

16  motive for the murder or otherwise highlight Taylor's comment that the killing was a "white

17  pride thing." (Opinion at 14.)  However, as set forth above, the state appellate court concluded

18  that petitioner had waived any objection to the admission into evidence of Taylor's mention of

19  "white pride" because of his failure to state a specif objection thereto at trial.  (Id. at 15.)

20  Respondent argues that the state court's ruling on petitioner's claim with regard to the "white

21  pride" statement constitutes a procedural bar precluding this court from addressing the merits of

22  this claim.

23           i.  Procedural Default

24           State courts may decline to review a claim based on a procedural default.

25  Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977).  As a general rule, a federal habeas court "will

26  not review questions of federal law presented in a habeas petition when the state court's decision

rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" <u>Cone v. Bell</u>, ___ U.S. ___, 129 S.Ct. 1769, 1780 (2009) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)).  The state rule for these purposes is only "adequate" if it is "firmly established and regularly followed." <u>Calderon v. United States District Court (Bean)</u>, 96 F.3d 1126, 1129 (9th Cir. 1996)  (quoting <u>Ford v. Georgia</u>, 498 U.S. 411, 424 (1991)).  <u>See also</u> <u>Scott v. Schriro</u>, ___F.3d___, 2009 WL 1519878, *4 (9th Cir. June 2, 2009) ("To constitute an adequate and independent state procedural ground sufficient to support a state court's finding of procedural default, "a state rule must be clear, consistently applied, and well-established at the time of petitioner's purported default."); <u>Bennett v. Mueller</u>, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and consistently applied.")  The state rule must also be "independent" in that it is not "interwoven with the federal law." <u>Park v. California</u>, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the claims may be reviewed by the federal court if the petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice. <u>Coleman</u>, 501 U.S. at 749-50.

Respondents have met their burden of adequately pleading an independent and adequate state procedural ground as an affirmative defense.  <u>See</u> <u>Bennett</u>, 322 F.3d at 586. Petitioner does not deny that his trial counsel did not raise a contemporaneous objection on due process grounds at trial to the admission into evidence of Burbank's "white pride" comment.  He asserts, however, that counsel made an objection to this evidence in his motion for new trial and argues that this objection was sufficient to preserve the issue for appeal.  (Pet. at 15.) Alternatively, petitioner argues that his trial counsel objected to Burbank's statements "as a whole on Evidence Code § 352 grounds, which would encompass an objection to irrelevant and unduly inflammatory evidence." (<u>Id.</u>)

1          Under California law, "[a] verdict may not be set aside on the basis of the

2   erroneous admission of evidence, even if prejudicial, unless the party asserting error has

3   preserved the question by a timely and specific objection to the admission of the evidence, or by

4   a motion to strike or exclude the evidence." People v. Williams, 44 Cal.3d 883, 906-07 (1988).

5   "While no particular form of objection is required . . . the objection must be made in such a way

6   as to alert the trial court to the nature of the anticipated evidence and the basis on which

7   exclusion is sought, and to afford the People an opportunity to establish its admissibility." Id.

8   "The circumstances in which an objection is made should be considered in determining its

9   sufficiency." Id.   In addition, California law provides that a verdict shall not be set aside by

10  reason of the erroneous admission of evidence unless:

11                  (a) There appears of record an objection to or a motion to exclude
                    or to strike the evidence that was timely made and so stated as to
12                  make clear the specific ground of the objection or motion; and (b)
                    The court which passes upon the effect of the error or errors is of
13                  the opinion that the admitted evidence should have been excluded
                    on the ground stated and that the error or errors complained of
14                  resulted in a miscarriage of justice.

15  (Cal. Evid. Code § 353.)

16          The state court record reflects that petitioner's counsel made the following

17  objection to Burbank's testimony:

18                  MR. WEBSTER: (petitioner's trial counsel):  I'd also interpose a
                    352 objection, your Honor, for the record.
19
                    THE COURT:  Sure.  You want to articulate that?
20
                    MR. WEBSTER:  Well, basically, that the statements are more
21                  prejudicial than probative.

22  (RT at 664.)  Later in the proceedings, petitioner's counsel objected to the entirety of Burbank's

23  testimony on the grounds that she may have had a motive to fabricate evidence against Taylor in

24  order to get him into prison and out of her life.  (Id. at 697-700.)  In neither instance did

25  petitioner's trial counsel specifically mention Burbank's testimony regarding "white pride" in

26  making his objection.

1    In light of the authorities cited above, this court rejects petitioner's argument that

2    counsel's objections during trial to the admissibility of Burbank's testimony preserved a

3    challenge to the statements she attributed to Taylor about "white pride."  Defense counsel's first

4    objection, described above, was extremely vague, and made no mention of the prejudice inflicted

5    on petitioner's defense by the insinuation that he was involved in gang activities.  Counsel's

6    second objection to the testimony was apparently on a different ground altogether.  In short,

7    petitioner's objections to the admissibility of Taylor's statements were too vague to preserve the

8    issue regarding the alleged erroneous admission of the "white pride" testimony for appeal.

9    Petitioner has also failed to support his argument that his objection in the motion

10   for new trial to the admissibility of Taylor's statements about "white pride" was sufficient to

11   overcome a procedural default.  On the contrary, petitioner's objection to this evidence, made

12   after the trial was over, does not appear to have been "timely" within the meaning of § 353 of the

13   California Evidence Code.  See People v. Morris, 53 Cal. 3d 152, 190 (1991), overruled on

14   another point in People v. Stansbury, 9 Cal. 4th 824, 830 n.1 (1995)), petition for writ of habeas

15   corpus granted in part on other grounds in Morris v. Woodford, 273 F.3d 826 (9th Cir. 2001)

16   (Evidence Code § 353 requires, among other things, that an objection to evidence be made "at a

17   time before or during trial when the trial judge can determine the evidentiary question in its

18   appropriate context"); 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 371, pp.

19   459-460 ("Where inadmissible evidence is offered, the party who desires to raise the point of

20   erroneous admission on appeal must object at the trial, specifically stating the grounds of the

21   objection, and directing the objection to the particular evidence that the party seeks to exclude").

22   Petitioner has failed to demonstrate that his trial counsel made a proper

23   contemporaneous objection to the challenged evidence.  Petitioner has also failed to meet his

24   burden of asserting specific factual allegations demonstrating the inadequacy of California's

25   contemporaneous-objection rule as unclear, inconsistently applied or not well-established, either

26   as a general rule or as applied to him.  Bennett, 322 F.3d at 586; Melendez v. Pliler, 288 F.3d

22

1   1120, 1124-26 (9th Cir. 2002).  Petitioner's claim is therefore procedurally barred.  <u>See</u> <u>Coleman</u>,

2   501 U.S. at 747; <u>Harris v. Reed</u>, 489 U.S. 255, 264 n.10 (1989); <u>Paulino v. Castro</u>, 371 F.3d

3   1083, 1092-93 (9th Cir. 2004) (claim that defendant's due process rights were violated by the

4   trial court's failure to instruct <u>sua</u> <u>sponte</u> on the definition of "major participant" was

5   procedurally barred because counsel failed to make a contemporaneous objection to the

6   instruction at trial).  Petitioner has failed to demonstrate that there was cause for his procedural

7   default or that a miscarriage of justice would result absent review of the claim by this court.  <u>See</u>

8   <u>Coleman</u>, 501 U.S. at 748; <u>Vansickel v. White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999).  The court

9   is therefore precluded from considering the merits of this claim.

10                              ii.  <u>Merits of Claim</u>

11          Nonetheless, even were this claim not procedurally barred, it lacks merit and relief

12   should be denied.  The admission into evidence of Taylor's statements regarding "a white pride

13   thing" did not render petitioner's trial fundamentally unfair.[5]  The brief and somewhat confusing

14   _____

15          [5] Burbank's exact testimony was as follows:

16          Q.  And did he mention that either he or any of these other people
            were involved in some sort of organization at that time?

17
            A.  He told me that the people that he was hanging out with were
18          no joke.  That they were serious.  That they had been called on to
            take care of a man who had molested a niece or a granddaughter of
19          someone they had been hanging with.

20          Q.  Okay.  Did he – and did he tell you what type of people these
            were that were no joke?

21
            A.  I think he – I believe he referred to it as like a white pride thing.
22
            Q.  And did he tell you actually what he was called on to do?
23          Well, let me rephrase that.  At that meeting did he tell you what he
            was called on to do?
24
            A.  He told me that somebody was called to take the gentleman out
25          and that they couldn't finish the job and that they looked at him to
            finish it.
26
     (RT at 684.)

                                        23

1   reference to an "organization" and "white pride" was not unduly prejudicial, was not mentioned

2   or highlighted by the prosecutor in the presentation of his case, did not indicate that petitioner

3   was a gang member, and could not have had a significant impact on the jury verdict in this case.

4   See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (On collateral review, an error is harmless

5   if it could not have had a "substantial and injurious effect or influence in determining the jury's

6   verdict").  The presentation of this evidence did not "fatally infect" the trial so as to render the

7   proceedings fundamentally unfair."  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

8   Accordingly, petitioner is not entitled to relief on this due process claim.

9           d.  State Law

10          Petitioner also claims that the admission into evidence of Taylor's hearsay

11  statements at his trial violated California Evidence Code § 1230.  (Pet. at 13-14.)  The state

12  appellate court's conclusion that Taylor's testimony met the requirements for admissibility under

13  that state law provision is binding on this court.  See Estelle, 502 U.S. at 67-68 (a federal writ is

14  not available for alleged error in the interpretation or application of state law); Aponte v. Gomez,

15  993 F.2d 705, 707 (9th Cir. 1993) (federal courts are "bound by a state court's construction of its

16  own penal statutes"); Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) (a federal

17  habeas court must defer to the state court's construction of its own penal code unless its

18  interpretation is "untenable or amounts to a subterfuge to avoid federal review of a constitutional

19  violation").  Accordingly, petitioner's arguments regarding the trial court's failure to comply

20  with the requirements of California Evidence Code § 1230 should be rejected.

21          B.  Admission of Petitioner's Statements/Coercive Police Interrogation Tactics

22          Petitioner's next claim is that the admission into evidence of inculpatory

23  statements he made to his friends over the telephone after he was questioned by the police

24  violated his right to due process because the statements came about as a result of coercive

25  interrogation tactics and outrageous government conduct.

26  /////

24

1.   <u>State Opinion</u>

The California Court of Appeal described the background to this claim and its decision thereon, as follows:

> Defendant's next challenge is to the introduction of his extra-judicial statements.  In his view, those statements should have been excluded because they were obtained "by exploiting improperly coercive and law-breaking interrogation tactics" that violated due process of law.
>
> After the murder, defendant received information that the investigators wanted to talk to him.  So he arranged to go in for an interview.  During the interview, defendant said the following:  He had met the victim, Sparks, once some time before the murder and had not seen the victim since then.  He had not been at Raible's house for two and one-half to three months.  On the weekend of the murder, he spent Saturday night with Taylor, first at dinner with some friends and then just driving around.  Around midnight, he took Taylor home and then went to his house to sleep.  He slept late on Sunday.  He had not been at Griffith's house on that weekend.  After defendant had told his story, the investigators confronted him with information they had been gathering.  Defendant denied that their information was accurate and terminated the interview.
>
> About a month later, defendant was in custody on an unrelated charge.  He sent a note to the investigators and asked to speak with them.  Defendant said that he had had time to think about what he did the weekend of the murder and added that, in the prior interview, he had been covering up his use of methamphetamine.  On this occasion, defendant admitted that he and Taylor had met the victim at a friend's house on Saturday night.  The victim asked for a ride to Raible's house in return for methamphetamine, and defendant agreed.  However, when defendant, Taylor, and the victim were outside alone, another person whom defendant did not know came by and the victim went with him, supposedly to Raible's house.  Defendant and Taylor went to Griffith's house, where the conversation about the victim's child molestation background occurred.  Eventually defendant, Taylor, and Cline went to Raible's house in order to use methamphetamine without having to share, and to bring the victim back to Griffith's house.  But when they arrived, there was no one at Raible's house.  They left defendant's mother's car at defendant's house and made their way back to Griffith's house.  They later borrowed Deptuch's car because they were otherwise without a vehicle.
>
> After hearing this revised version of events, investigators began to confront defendant.  Among other things, they told him that Cline had confessed and had implicated defendant and Taylor.  And they

25

showed defendant a falsified report, purportedly from the Department of Justice. The report stated, in relevant part: "The carpeting from the Ford Explorer was visually examined for the presence of blood, hair and fibers. Red, brown stains appearing to be dried blood were chemically tested and gave a positive presumptive test for blood. A few hairs and/or fibers were collected from the Ford Explorer carpeting. The fibers collected were consistent with fibers removed from bedding retrieved at the scene where Thomas Sparks' body was located."

Defendant continued to deny involvement. When he said that he wanted to consult a lawyer, the investigators initially did not cease questioning, but then their captain entered and stopped the interview. Following termination of the interview, defendant was returned to the jail, where he made four monitored and recorded telephone calls from a jailhouse telephone.

On defendant's motion to suppress, the trial court found that the investigators' use of a falsified Department of Justice report violated due process. The court reasoned that, while the use of deception may be permissible, purporting to show a suspect hard evidence in the form of a falsified report was unacceptable. The court initially ruled that the second interview, from the time the report was shown to defendant, and all four telephone calls would be excluded.

On the prosecution's motion for reconsideration, the court adhered to its conclusion that the use of the false report violated due process. However, the court determined that the second portion of the third telephone call and the entire fourth telephone call were admissible. The court reasoned that during the first part of the third telephone call, defendant was informed that Cline was not in custody and at this point his whole demeanor changed. The court found the conversations after that to be sufficiently attenuated from the original violation.

Defendant contends this was error. We disagree for reasons that follow.

Lies told by police officers to a suspect under interrogation are part of the "totality of the circumstances" that may be considered in determining whether an ensuing confession was voluntary. (People v. Farnam (2002) 28 Cal.4th 107, 182-183, 121 Cal.Rptr.2d 106, 47 P.3d 988.) But lies are not per se sufficient to make a confession involuntary. (People v. Musselwhite (1998) 17 Cal.4th 1216, 1240, 74 Cal.Rptr.2d 212, 954 P.2d 475.) "Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted." (People v. Farnam, supra, 28 Cal.4th at p. 182, 121 Cal.Rptr.2d 106, 47 P.3d 988.) Moreover, to support suppression "there must be a proximate causal connection between the deception or subterfuge

and the confession. 'A confession is "obtained" . . . if and only if inducement and statement are linked, as it were, by "proximate" causation . . . .  The requisite causal connection between promise [or deception] and confession must be more than "but for": causation-in-fact is insufficient."'  (People v. Musselwhite, supra, 17 Cal.4th at p. 1240, 74 Cal.Rptr.2d 212, 954 P.2d 475.)

Under this standard, we have serious doubt as to the validity of the trial court's determination that any of defendant's extra-judicial statements should be excluded.  However, this is not an issue we need resolve.  Defendant's interview statements following the presentation of the fabricated Department of Justice report, the first two telephone calls, and the first part of the third telephone call were excluded from evidence.  We need consider only the admission of the second portion of the third telephone call and the fourth telephone call.

"Incriminating statements by a defendant are admissible despite previous unlawful governmental conduct if they are 'sufficiently an act of free will to purge the primary taint' [citation], or, phrased differently, if the connection between the illegality and the confession 'had "become so attenuated as to dissipate the taint."'"  (People v. Beardslee (1991) 53 Cal.3d 68, 108, 279 Cal.Rptr. 276, 806 P.2d 1311.)  We are satisfied the evidence that was admitted was so attenuated as to be purged of any taint.  Numerous factors support our conclusion:

(1)  Upon being confronted with the false report, defendant did not break down and confess.  He continued to adhere to his story and deny involvement.  When a defendant is coerced into confessing, then subsequent incriminating statements will generally, but not invariably, be considered a product of the first confession.  (People v. Stroble (1951) 36 Cal.2d 615, 623, 226 P.2d 330.)  This is not such a case because here there was no initial overbearance of defendant's will.

(2)  The statements in the telephone calls were not made to the investigators as the result of interrogation; rather, they were voluntarily made to defendant's friends, Tracy and Danielle.  Tracy and Danielle were not government agents or informers, and they were not cooperating with investigators to obtain incriminating statements from defendant.  (See People v. Catelli (1991) 227 Cal.App.3d 1434, 1443, 278 Cal.Rptr. 452.)

(3)  During his first interview, defendant indicated full awareness that jailhouse conversations are monitored and recorded, and chided the investigator for suggesting that someone who had been in the system would not know this.  He indicated similar awareness during the telephone calls.

/////

27

(4)  During the telephone calls, defendant repeatedly indicated a belief that the investigators were trying to trick him or scare him into giving up information and said that the evidence they claimed to have was doctored for this purpose.

(5)  During the calls, defendant repeatedly indicated a belief that the investigators lacked evidence with which to charge him.

(6)  During the calls, defendant told Tracy and Danielle the version of the events he had told the investigators, and repeatedly told them to relay that version to Taylor and Cline.

(7)  During the calls, defendant repeatedly told Tracy and Danielle to reach Taylor and Cline and tell them not to talk to the investigators.  He added that, if the investigators attempted to talk to them, they should demand a lawyer because that would prevent interrogation.

(8)  At the conclusion of last [sic] call, defendant said that he was relieved and that they should be happy for him, but again urged them to reach Taylor and Cline at once.

From those telephone conversations, it is apparent that defendant did not believe the investigators and did not believe they had sufficient evidence with which to charge him.[6]  Defendant believed that if he, Taylor, and Cline refused to confess, then he would not be charged.  Although he knew the calls were monitored and recorded, he believed it was essential to relay his version of the events to Taylor and Cline, to tell them not to talk to the investigators, and to advise them that insistence upon a lawyer would preclude interrogation.  This was not an instance in which defendant's will was overborne by unlawful interrogation practices.  Rather, defendant voluntarily made statements to his friends, despite his awareness that the calls would be monitored, because he believed that getting a message to Taylor and Cline was essential to avoidance of responsibility for the crime.  The court did not err in admitting those statements.

(Opinion at 16-22.)

/////

---

[6]  During his third telephone call from the jail, defendant spoke first to his friend Tracy and then to his friend Danielle.  When he learned from Tracy that Cline had not been arrested, defendant's demeanor changed.  The court admitted the third call from the point at which Danielle came on the line.  In speaking to Danielle, defendant initially said "they're gonna charge us with something, irregardless you know?"  He said his goal would be to fight for involuntary manslaughter.  But the news that Cline had not been arrested quickly changed his tone.  It is apparent from this point that defendant believed he would not be charged unless he, Taylor, or Cline confessed.

28

2. <u>Petitioner's Claim</u>

Before this court petitioner again contends that the police used coercive techniques during the interrogation on March 14, 2001, which led to his involuntary and incriminating statements made to his friends.  Petitioner specifically complains about the false investigative report, references to the death penalty,[7] the false assertion by police that Carla Cline had confessed and implicated petitioner, and the detectives' initial refusal to honor his requests for counsel.  (Pet. at 16-20.)  He contends that these coercive interrogation tactics "bore a direct causal relationship" to the inculpatory telephone statements admitted into evidence against him because he was "motivated to make the telephone calls and the statements in them by the coercive interrogation tactics to which he was subjected."  (<u>Id.</u> at 20.)  Petitioner asserts that "in their continued quest to obtain self-incriminatory statements from Mr. Sutherland, interrogators put him into a cell with a telephone and taped all his telephone conversations for the ensuing course of the day and evening."  (<u>Id.</u> at 18.)  Petitioner argues that the coercive police conduct

> makes it clear that the interrogators intended to gather evidence in the form of Mr. Sutherland's statements made to others in the wake of the officers' misconduct.  Nothing broke the causal chain. Petitioner was continuously in custody.  All four calls were made from the same jail cell on the same day as the interrogation.

(<u>Id.</u> at 21.)  Petitioner also contends that he was not relieved of the coercive effect of the interrogation tactics by learning that Carla Cline was not in custody, because he didn't know why she had been released.  (<u>Id.</u>)  Petitioner argues that the substance of the telephone calls reflect that he was still under the influence of the officers' coercive tactics and that there was "no attenuation or break in the causal chain."  (<u>Id.</u> at 21-22.)

Citing the decision in <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), petitioner argues, "there can be no reasonable dispute that the statements Mr. Sutherland made in the third and fourth telephone conversations were obtained by exploiting the unlawful conduct of officers

---

[7] Interrogating Officer Hubbard acknowledged on direct examination at petitioner's trial that he had told petitioner he was facing the death penalty.  (RT at 1149.)

29

during the interrogation." (Pet. at 22.)  Petitioner also asserts that he would not have made

incriminating comments over the telephone, knowing he was being recorded, unless he was in a

state of panic induced by the officers' unlawful conduct.  (Traverse at 6-7.)  Petitioner

acknowledges that "he did not believe the officers" and "did not believe the officers had enough

evidence to charge him."  (Id. at 7.)  However, he argues that the state court refused "to recognize

the impact on the psyche of an individual, sophisticated or not, when confronted with a falsified

official police (report)."  (Id.)  Finally, petitioner argues that his conviction should be reversed on

the grounds that outrageous governmental conduct violated his right to due process.  (Pet. at 22-

23.)

        In essence, petitioner is claiming that: (1) his telephone conversations with his

friends were essentially the equivalent of continued police interrogation because, by placing him

in a cell with a telephone, the police expected that petitioner would make incriminating

statements; (2) the inculpatory statements he made to his friends were coerced by the

immediately preceding improper interrogation tactics of police and were thus involuntary and

inadmissible; and (3) no intervening event attenuated the original illegality of the police

interrogation tactics so as to render his statements to his friends a voluntary act.

        As noted above, the California Court of Appeal declined to resolve whether the

police engaged in coercive tactics.  (Opinion at 19.)  Instead, the state appellate court determined

that petitioner's statements in the telephone calls were sufficiently removed from the taint of any

possible police coercion that they could properly be admitted into evidence at petitioner's trial.

(Id. at 19-20.)  Put another way, the state appellate court concluded that petitioner's statements in

the second half of the third telephone call and in the fourth telephone call were "sufficiently an

act of free will to purge the primary taint" of any arguably unlawful interrogation tactics.  Wong

Sun, 371 U.S. at 486.

/////

/////

1          3. Legal Standards

2          The Constitution demands that confessions be made voluntarily.  See Lego v.

3   Twomey, 404 U.S. 477, 483-85 (1972).  Involuntary confessions may not be used to convict

4   criminal defendants because they are inherently untrustworthy and because society shares "the

5   deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life

6   and liberty can be as much endangered from illegal methods used to convict those thought to be

7   criminals as from the actual criminals themselves."  Spano v. New York, 360 U.S. 315, 320-21

8   (1959).[8]  The requirement that a confession be voluntary to be admitted into evidence is based on

9   the due process clause of the Fourteenth Amendment and the Fifth Amendment right against self-

10  incrimination.  Dickerson v. United States, 530 U.S. 428, 433 (2000); Doody v. Schriro, 548 F.3d

11  847, 858 (9th Cir. 2008).  The due process protection "stems from the principle that 'tactics for

12  eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by

13  the Fourteenth Amendment's guarantee of fundamental fairness.'"  Doody, 548 F.3d at 858

14  (quoting Miller v. Fenton, 474 U.S. 104, 110 (1985)).

15         A confession is voluntary only if it is "the product of a rational intellect and a free

16  will."  Townsend v. Sain, 372 U.S. 293, 307 (1963).  See also Blackburn v. Alabama, 361 U.S.

17  199, 208 (1960).  "The line of distinction is that at which governing self-direction is lost and

18  compulsion, of whatever nature or however infused, propels or helps to propel the confession."

19  Collazo v. Estelle, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting Culombe v. Connecticut,

20  367 U.S. 568, 602 (1961)).   There is no "talismanic definition of 'voluntariness'' that is

21  "mechanically applicable."  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) (quoting

22  Schneckloth v. Bustamonte, 412 U.S. 218, 224 (1973)).  Rather, voluntariness is to be

23  determined in light of the totality of the circumstances.  See Miller, 474 U.S. at 112; Haynes v.

24

25         [8]  Although petitioner's incriminating statements were not a full confession, the analysis
    of their voluntariness remains the same.  United States v. Orso, 266 F.3d 1030, 1041 n.1 (9th Cir.
26  2001), abrogated on other grounds by Missouri v. Seibert, 542 U.S. 600 (2004).

1    <u>Washington</u>, 373 U.S. 503, 513 (1963); <u>Doody</u>, 548 F.3d at 858-59.  This includes consideration

2    of both the characteristics of the petitioner and the details of the interrogation.  <u>Schneckloth</u>, 412

3    U.S. at 226.  In the end the court must determine under the totality of the circumstances whether

4    "the government obtained the statement by physical or psychological coercion or by improper

5    inducement so that the suspect's will was overborne."  <u>Beaty v. Stewart</u>, 303 F.3d 975, 992 (9th

6    Cir. 2002) (quoting <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988)).  <u>See</u>

7    <u>also</u> <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976); <u>Haynes v. Washington</u>, 373 U.S. 503, 513-14 (1963).

8    "[B]y its nature, the voluntariness inquiry requires a case-by-case assessment, leading courts to

9    grapple with the application of voluntariness principles in a variety of circumstances."  <u>Doody</u>,

10   548 F.3d at 859 (citing <u>Schneckloth</u>, 412 U.S. at 224).

11          False statements by the police may render a confession invalid.  <u>See</u>, <u>e.g.</u>, <u>Lynumn</u>

12   <u>v. Illinois</u>, 372 U.S. 528, 534 (1963) (confession found to be coerced by officers' false statements

13   that state financial aid for defendant's infant children would be cut off, and her children taken

14   from her, if she did not cooperate); <u>Spano</u>, 360 U.S. at 323 (confession found to be coerced

15   where police instructed a friend of the accused to falsely state that petitioner's telephone call had

16   gotten him into trouble, that his job was in jeopardy and that loss of his job would be disastrous

17   to his three children, his wife and his unborn child).  However, "misrepresentations made by law

18   enforcement in obtaining a statement, while reprehensible, does not necessarily constitute

19   coercive conduct."  <u>Pollard v. Galaza</u>, 290 F.3d 1030, 1034 (9th Cir. 2002).  So long as a police

20   officer's misrepresentations or omissions are not of a kind likely to produce a false confession,

21   confessions prompted by deception constitute admissible evidence.  <u>See</u>, <u>e.g.</u>, <u>Frazier v. Cupp</u>,

22   394 U.S. 731, 739 (1969) (confession admissible even though officer falsely told the suspect his

23   accomplice had been captured and confessed).

24          Various state courts have considered whether police conduct in manufacturing a

25   false document and showing it to the accused, as opposed to simply making a false oral

26   statement, constitutes coercive activity sufficient to require the exclusion at trial of any resulting

inculpatory statements.[9]  For instance, the Nevada Supreme Court has concluded that the

subterfuge engaged in by police in manufacturing a false lab report for use in interrogating the

defendant was not per se coercive but was simply one circumstance to be considered in

determining whether subsequent inculpatory statements made by the defendant were voluntary.

Sheriff, Washoe County v. Bessey, 914 P.2d 618, 620 (Nev. 1996).  The court noted that the

report was not reasonably likely to produce a false confession because it "would not have

implicated any concerns on [defendant's] part other than consideration of his own guilt or

innocence and the evidence against him."  Id. at 621.  Likewise, in Lincoln v. State of Maryland,

882 A.2d 944, 956 (Md. App. 2005), the Maryland Court of Special Appeals held that the use of

a police-fabricated document as a ploy to deceive a defendant into thinking the state has evidence

of guilt, or greater knowledge than it actually has, is a relevant factor to be considered in deciding

whether, in the totality of the circumstances, the defendant's confession was freely and

voluntarily made, but is not, in and of itself, dispositive of the issue.  See also Arthur v. Com.,

480 S.E.2d 749, 752 (Va. App. 1997) (Virginia Court of Appeals holding that the presentation to

a defendant of fabricated fingerprint and DNA reports did not overcome defendant's will or

critically impair his capacity for self-determination; therefore, his subsequent confession was

voluntary and admissible.).  But see State v. Cayward, 552 So.2d 971, 974-75 (Fla. App. 2 Dist.

1989) (Florida Court of Appeal determining that the use of fabricated laboratory reports to secure

/////

/////

/////

---

[9]  In People v. Mays, 173 Cal App. 4th 1145 (2009), a panel of the California Court of Appeal for the Third Appellate District noted a lack of consensus among state courts on the issue, but concluded that police fabrication and use of tangible evidence (a mock polygraph test and fake test results) was not per se coercive, but was merely one factor to consider in determining whether the defendant's confession was voluntary.  However, the decision in Mays was subsequently withdrawn from publication and a petition for review in that action is now pending before the California Supreme Court.

1 a confession was coercive per se and violated defendant's constitutional right to due process,

2 resulting in the suppression of defendant's confession.)[10]

3        When police obtain inculpatory evidence as an indirect result of improper

4 conduct, the defendant bears the initial burden of coming forward with a showing that such

5 evidence was tainted by – i.e., causally linked to – the primary illegality.  Alderman v. United

6 States, 394 U.S. 165, 183 (1969); Nardone v. United States, 308 U.S. 338, 341 (1939); United

7 States v. Polizzi, 500 F.2d 856, 910 (9th Cir. 1974).  The defendant must show more than that the

8 challenged evidence "would not have come to light but for the illegal actions of the police;"

9 rather, "the more apt question . . . is whether, granting establishment of the primary illegality, the

10 evidence to which instant objection if made has been come at by exploitation of that illegality or

11 instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun, 371

12 U.S. at 487-88.  See also Brown v. Mississippi 297 U.S. 278, 286 (1936) (suppressing both

13 statements made by the defendant after an illegal arrest, notwithstanding the giving of Miranda

14 warnings, where first statement was separated from the illegal arrest by less than two hours and

15 there was no intervening event of significance and second statement was the result and the fruit

16 of the first statement).

17        If the defendant makes a showing that the challenged evidence was causally

18 linked to the primary illegality, the ultimate burden then shifts to the prosecution to prove that the

19 statements are "sufficiently an act of free will to purge the primary taint."  Wong Sun, 371 U.S.

20 at 486.  See also Alderman, 394 U.S. at 183; Nardone, 308 U.S. at 341.  Factors to be considered

21 in this analysis are whether: "(1) there was a break in the stream of events sufficient to insulate

22 the statement from the effect of the prior coercion, (2) it can be inferred that the coercive

23 practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a

24

25     [10]  The record in the case before this court reflects that the state court trial judge relied on
the decision in Cayward to support his initial ruling excluding petitioner's statements made at the
26 police interrogation after he was shown the false lab report and all four telephone conversations.
(RT at 137.)

change in the location of the interrogation, or a change in the identity of the interrogators

interrupted the effect of the coercion, and (4) the conditions that would have precluded the use of

a first statement had been removed." Collazo, 940 F.2d at 421 (defendant's waiver of Miranda

rights was the result of police coercion and his subsequent statement given after he initiated a

second interrogation with officers was the result of the earlier coercion). See also Williams v.

Woodford, 384 F.3d 567, 595 (9th Cir. 2004).[11]

       In the analogous situation where a suspect makes a statement to police that is

coerced and then makes a subsequent confession to the police, the appropriate inquiry in

determining the admissibility of the subsequent statements is whether the coercion surrounding

the first statement had been sufficiently dissipated so as to render the second statement voluntary.

Darwin v. Connecticut, 391 U.S. 346, 349 (1968); Leyra v. Denno, 347 U.S. 556, 561 (1954);

United States v. Shi, 525 F.3d 709, 727 (9th Cir. 2008).  In that context, to establish the

admissibility of the evidence the government must show intervening circumstances indicating

that the second confession was "insulate[d] ... from the effect of all that went before." Clewis v.

Texas, 386 U.S. 707, 710 (1967).  See also Oregon v. Elstad, 470 U.S. 298, 310 (1985) ("when a

prior statement is actually coerced, the time that passes between confessions, the change in place

of interrogations, and the change in identity of the interrogators all bear on whether that coercion

has carried over into the second confession"); United States v. Lopez, 437 F.3d 1059, 1066 (9th

Cir. 2006) (a second confession found to be inadmissible where intervening circumstances failed

to show that the second confession was insulated from the earlier coerced confession); Douglas

v. Woodford, 316 F.3d 1079, 1092 (9th Cir. 2003) (confession on witness stand not tainted by

---

    [11]   The "primary illegality" in both Wong Sun and Brown was an illegal arrest.  In Collazo, the primary illegality was an attempt by the police to coerce a Miranda waiver and a waiver of the privilege against self-incrimination.  The court in Collazo found these differences "insignificant" insofar as they might affect the application of the holdings in Wong Sun and Brown.  Collazo, 940 F.2d at 421 n.9.  Here, the primary illegality was the use of a false document and other coercive tactics in the course of an interrogation.  As in Collazo, this court finds these factual differences do not preclude the use of the foregoing authority as precedent.

1  previous coerced confession in Mexico); Williams, 384 F.3d at 595 (witnesses' trial testimony

2  two years after illegal interrogation found to be sufficiently voluntary and not tainted).

3         4.  Analysis

4         In this case, petitioner's challenged statements were not made to the interrogating

5  police officers, but to petitioner's friends in subsequent telephone calls.  One question raised by

6  this set of circumstances is whether petitioner's conversations with his friends can be viewed as

7  simply a continuation of the prior police interrogation.  While interrogation usually takes the

8  form of direct questioning, there are situations where interrogation can occur through indirect

9  means.  The United States Supreme Court has held that  "interrogation" consists of both express

10 questioning by the police and also "its functional equivalent."  Rhode Island v. Innis, 446 U.S.

11 291, 301 (1980).  The court defined the term "functional equivalent" as "any words or actions on

12 the part of the police (other than those normally attendant to arrest and custody) that the police

13 should know are reasonably likely to elicit an incriminating response from the suspect."  Id.  This

14 "functional equivalent" test "focuses primarily upon the perceptions of the suspect, rather than

15 the intent of the police;" – that is, whether the suspect would conclude that he was being subject

16 to a custodial police interrogation.  Id.

17        Under certain circumstances, questioning by private third parties has been found

18 to bear the stamp of official authority and thus to constitute the functional equivalent of police

19 interrogation.  See, e.g., Estelle v. Smith, 451 U.S. 454, 467 (1981) (questioning by

20 court-appointed competency psychiatrist found to implicate the defendant's Miranda rights);

21 Wilson v. O'Leary, 895 F.2d 378, 380-81 (7th Cir. 1990) (holding Miranda applicable where

22 sheriff detained defendant against his will in a vacant lot so husband of victim could interrogate

23 him).  Instructive in this regard is the case of Arizona v. Mauro, 481 U.S. 520 (1987).  There, the

24 defendant argued that he was subject to interrogation when the police allowed him to speak with

25 his wife in the presence of a police officer.  Id. at 527.  The Supreme Court concluded that

26 Mauro's conversation with his wife did not constitute interrogation because Mauro "was not

36

1  subjected to compelling influences, psychological ploys, or direct questioning," and there was no

2  evidence that "the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting

3  incriminating statements." Id. at 528.  Although the officers were aware that Mauro might

4  incriminate himself during the conversation with his wife, the Supreme Court concluded that

5  "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." Id. at

6  529.  See also Coolidge v. New Hampshire, 403 U.S. 443, 487-488 (1971) (defendant's wife was

7  not acting as an instrument or agent of the police when she searched their house without a

8  warrant and gave police incriminating evidence; therefore "the conduct of the police officers at

9  the Coolidge house was [not] such as to make her actions their actions for purposes of the Fourth

10  and Fourteenth Amendments and their attendant exclusionary rules"); United States v.

11  Kimbrough, 477 F.3d 144, 151 (4th Cir. 2007) (holding that the police did not subject the

12  defendant to improper interrogation when they brought his mother to the basement to see drugs

13  stored there because there was "no evidence in the record of a tacit agreement, discussion, or

14  understanding between the police officers and defendant's mother that she would ask questions

15  or attempt to elicit incriminating information."); United States v. Gaddy, 894 F.2d 1307, 1311

16  (11th Cir. 1990) (suspect in custody was not interrogated when aunt, who was employed by the

17  police department, urged him to tell police what he knew about a crime); Snethen v. Nix, 885

18  F.2d 456, 457 (8th Cir. 1989) (suspect in custody was not interrogated when he confessed after a

19  conversation with his mother, who had told police before the conversation that "if [my son] did

20  this, he will tell me."); Endress v. Dugger, 880 F.2d 1244, 1248-49 (9th Cir. 1989) (detective

21  who was close friend of defendant and visited him to inquire on his well-being rather than at

22  direction of officer connected with investigation did not subject defendant to "functional

23  equivalent of interrogation," and thus, statements made by defendant to detective were not

24  obtained in violation of Miranda); Cobb v. Kernan, No. 2:04-cv-1299 JKS EFB, 2008 WL

25  110995, *3 (E.D. Cal. Jan. 9, 2008) (denying habeas relief where the challenged statement was

26  given to petitioner's girlfriend who was allowed by police to speak with him at her request);

1  Hovey v. Calderon, No. C 89-1430 MHP, 1996 WL 400979, *29 (N.D. Cal. July 10, 1999)

2  ("Thus, if petitioner had made inculpating statements to his father even in response to his father's

3  questions, the statements would be admissible and not in violation of petitioner's Fifth

4  Amendment rights unless his father was being used by the government for this purpose [ ] even if

5  the statements are known by petitioner to be monitored.")

6          The present case does not present a situation on all fours with any of the cases

7  cited above.  In none of the cases involving a defendant's inculpatory statements to third parties

8  was there any evidence of the use of deceit by police as there is in this case.  In addition, unlike

9  cases involving incriminating statements made by a defendant after police coercion, here

10  petitioner did not make his statements to the police but to his friends.  Nonetheless, after an

11  analysis of the record, this court concludes that the state court's decision that the limited

12  inculpatory statements admitted into evidence at petitioner's trial were voluntarily made and

13  properly admitted into evidence is not contrary to or an unreasonable application of federal law

14  and should not be set aside.

15          The undersigned finds that the conduct of law enforcement in deliberately

16  manufacturing a false laboratory report, complete with forged signature, in an attempt to get a

17  confession from petitioner, was coercive.  This tactic "shock[ed] the conscience" of the trial

18  judge, who determined that "it does offend basic notions of fairness."  (RT at 137, 426.)  The

19  undersigned agrees with that assessment.[12]  Nonetheless, deception by the police is only one

20  factor to consider among the totality of circumstances in determining the voluntariness of

21  petitioner's statements.  Frazier, 394 U.S. at 739; Holland v. McGinnis, 963 F.2d 1044, 1051 (7th

22  Cir. 1992).  Some courts have opined that a lie by police that relates to a suspect's connection to

23  the crime, as the one in this case did, is the least likely to render a confession involuntary because

24  _____

25          [12]  In addition, the interrogating police detectives did not immediately honor petitioner's
    requests for counsel and petitioner was repeatedly threatened by the interrogators with the death

26  penalty.  The trial court found that these three factors rendered the environment coercive.  (RT at
    428-29).  The undersigned agrees.

1   it does not cause the suspect to consider anything beyond his connection to the crime and the

2   sufficiency of the evidence gathered by police.  Holland, 963 F.2d at 1051; United States v.

3   Velasquez, 885 F.2d 1076, 1088-89 & n.11 (3d Cir. 1989).  The subterfuge in this case did not

4   rise to the level of the lies utilized by the police in Lynumn v. Illinois, 372 U.S. at 534 ( false

5   statements that state financial aid for the defendant's infant children would be cut off, and her

6   children taken from her, if she did not cooperate) or Spano v. New York, 360 U.S. at 323 ( police

7   instructed a friend of the accused to falsely state that petitioner's telephone call had gotten him

8   into trouble, that his job was in jeopardy and that loss of his job would be disastrous to his three

9   children, his wife and his unborn child), which ran the risk of causing an innocent person to

10  confess.  Rather, here the falsehood by the police involved the weight of the evidence gathered

11  which pointed to petitioner's involvement in the murder.  The court also notes that the conduct of

12  the police in this case was not so coercive that it caused petitioner to admit his involvement at

13  once.  Even after the police showed petitioner the fabricated laboratory results, he continued to

14  deny involvement in the murder of Sparks.  It was not until he later spoke to his friends that he

15  made incriminating remarks.  This fact suggests that petitioner's will was not overborne by the

16  police ruse.

17          In addition, petitioner was given adequate Miranda warnings at his initial

18  interrogation.  Although this fact is not determinative on the question of voluntariness, it is one

19  factor to consider in the analysis.  See Withrow v. Williams, 507 U.S. 680, 693-94 (1993);

20  Doody, 548 F.3d at 860-61 (whether a defendant was given Miranda warnings is one

21  circumstance to consider in determining whether a confession is voluntary but is not

22  determinative on that question).  But see Missouri v. Seibert, 542 U.S. 600, 608-09 (2004)

23  (giving Miranda warnings "has generally produced a virtual ticket of admissibility . . . and

24  litigation over voluntariness tends to end with the finding of a valid waiver"); Berkemer v.

25  McCarty, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable

26  /////

1   argument that a self incriminating statement was 'compelled' despite the fact that the law

2   enforcement authorities adhered to the dictates of <u>Miranda</u> are rare").

3          Furthermore, the incriminating statements in question were made by petitioner to

4   his friends and not to the police.  It appears that petitioner called his friends in an attempt to

5   orchestrate matters so that his involvement in the crime would either go undetected or would

6   result in a lesser charge than murder.  There is no allegation that the police forced petitioner to

7   make these phone calls or suggested in any way that he do so.  Although petitioner suspected his

8   calls were being recorded, there is no evidence that he believed the phone calls constituted a

9   continued interrogation.  Rather, petitioner voluntarily made incriminating statements, knowing

10  the danger in doing so, because he apparently wished to control the actions of his friends and

11  believed that outweighed the danger involved in making the calls.  Even if the detectives placed

12  petitioner in a cell with a telephone in the hope that he would use the telephone to make

13  incriminating statements, this fact would not convert the conversations into the "functional

14  equivalent" of continuing police interrogation.  <u>Innis</u>, 446 U.S. at 301.  During the calls

15  themselves, petitioner was not subjected to "compelling influences" of any kind, "psychological

16  ploys," or direct questioning from police.  <u>Id.</u> at 529.  The police were not even present.  There is

17  no evidence or suggestion that petitioner's friends were acting on behalf of the police, nor was

18  petitioner subject to any "interrogation" by his friends.  Accordingly, this court concludes that

19  petitioner's telephone calls to his friends were not part of a continuing police interrogation.

20         The California Court of Appeal found that the telephone calls were "sufficiently

21  an act of free will to purge the primary taint" of the police interrogation, largely because they

22  were made to petitioner's friends, and not the police, and because petitioner was aware he was

23  being monitored but made the calls anyway because he wished to control the investigation.

24  (Opinion at 19-22.)  The appellate court also concluded that petitioner's will was not overborne

25  by the police subterfuge because he did not immediately "break down and confess" and because

26  he expressed awareness that the police were trying to trick or scare him.  (Opinion at 19-20.)  The

1    California Court of Appeal determined that petitioner's tone and demeanor changed during the

2    third telephone call to his friends after he was informed that Cline had not been arrested and that

3    after this point his statements were not the result of prior police coercion.  (Id. at 21 n.2.)

4    Similarly, the state trial court concluded that once petitioner was informed Carla Cline was not in

5    custody and became aware that the police had not been truthful with him, he voluntarily chose to

6    continue speaking with his friends and his subsequent inculpating statements were therefore

7    admissible.  (RT at 254.)  The decision of the state courts that the circumstances had changed

8    sufficiently by the second portion of petitioner's third telephone conversation with his friends so

9    as to dissipate any taint resulting from the prior police coercion is not an unreasonable

10   determination of the facts in this case.  By the time petitioner made the incriminating statements

11   that were admitted into evidence at his trial, there had been a significant break in time from the

12   police interrogation; petitioner had been made aware that the police had lied to him, thereby

13   lessening the impact of the fraudulent lab report and other coercive tactics; the persons to whom

14   petitioner was speaking were not connected with law enforcement in any way; the location had

15   changed; and the police officers had been removed from the situation.  All of these factors

16   support the state courts' finding that petitioner's inculpatory statements to his friends, starting

17   from the second portion of the third telephone call, were voluntarily made.

18              This court concludes that by the time petitioner made these statements, the only

19   inculpatory statements admitted into evidence at his trial, the improper police conduct had been

20   sufficiently attenuated and that therefore the statements were properly admitted into evidence.

21   The ruling of the trial court in suppressing petitioner's statements until such time as the police

22   tactics had been exposed and largely neutralized ensured that the statements actually admitted

23   into evidence were voluntary.  Regardless of whether the interrogating officers' statements were

24   false, misleading, or intended to trick and cajole petitioner into confessing, this court finds that

25   under the totality of the circumstances petitioner's will was not overborne by the  conduct of

26   /////

1  police with respect to the statements admitted into evidence against him.  Accordingly, petitioner

2  is not entitled to relief on this claim.

3              5.  Outrageous Government Conduct

4              Petitioner next argues that the police conduct in this case was so outrageous as to

5  constitute a substantive due process violation mandating the automatic reversal of his conviction.

6  In this regard, petitioner alleges that the police officers violated his right to due process when

7  they repeatedly lied to him about the evidence implicating him, manufactured the fake lab report,

8  ignored his requests to consult with an attorney, and then monitored his telephone conversations.

9  (Pet. at 22.)  Petitioner notes that the state trial court determined the officers' conduct constituted

10 a "due process violation."  (RT at 137, 426.)

11             This court rejects petitioner's claim that the police actions in this case were so

12 outrageous that he is entitled to habeas relief on this basis alone.  The defense of outrageous

13 government conduct is limited to extreme cases in which the government's conduct violates

14 fundamental fairness and is "shocking to the universal sense of justice mandated by the Due

15 Process Clause of the Fifth Amendment."  United States v. Russell, 411 U.S. 423, 432 (1973)

16 (quotations omitted).  See also Rochin v. California, 342 U.S. 165 (1952) (use at trial of

17 morphine capsules physically extracted from defendant's body by state action violated Due

18 Process Clause of Fourteenth Amendment and resulted in dismissal of case).  The Court of

19 Appeals for the Ninth Circuit has found outrageous government conduct in instances where the

20 government has "engineer[ed] and direct[ed] the criminal enterprise from start to finish," United

21 States v. Smith, 924 F.2d 889, 897 (9th Cir. 1991), and in "that slim category of cases in which

22 the police have been brutal, employing physical or psychological coercion against the defendant."

23 United States v. Bogart, 783 F.2d 1428, 1435 (9th Cir. 1986) (citation omitted), vacated in part

24 on other grounds sub nom. United States v. Wingender, 790 F.2d 802 (9th Cir. 1986).  To prevail

25 on such a claim,  "[i]n short, a defendant must meet an extremely high standard."  Smith, 924

26 F.2d at 897.

                                            42

1    Even assuming the "due process" defense is clearly established federal law, the

2    California Court of Appeal reasonably concluded that the behavior of the police in this case did

3    not fall within the narrow class of cases contemplated by Russell. The conduct engaged in by

4    police here, while improper, cannot be said to be so grossly shocking or outrageous as to violate

5    "the universal sense of justice." Accordingly, petitioner is not entitled to relief on this claim.

6    C.   Jury Instruction Error

7    Petitioner also raises several claims for habeas relief involving jury instruction

8    error. After setting forth the applicable legal principles, the court will analyze these claims in

9    turn below.

10    1.   Legal Standards

11    A challenge to jury instructions does not generally state a federal constitutional

12    claim. See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle, 456 U.S. at 119); Gutierrez v.

13    Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). Habeas corpus is unavailable for alleged error in

14    the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v.

15    Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir.

16    1986). However, a "claim of error based upon a right not specifically guaranteed by the

17    Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

18    infects the entire trial that the resulting conviction violates the defendant's right to due process."

19    Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

20    Cir. 1980)). See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such

21    a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that

22    the resulting conviction violates due process.") The analysis for determining whether a trial is

23    "so infected with unfairness" as to rise to the level of a due process violation is similar to the

24    analysis used in determining, under Brecht, 507 U.S. at 623, whether an error had "a substantial

25    and injurious effect" on the outcome. See McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir.

26    1993).

43

1    In order to warrant federal habeas relief, a challenged jury instruction "cannot be

2   merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

3   process right guaranteed by the fourteenth amendment." Prantil, 843 F.2d at 317 (quoting Cupp

4   v. Naughten, 414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate

5   the challenged jury instructions "'in the context of the overall charge to the jury as a component

6   of the entire trial process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228,

7   1239 (9th Cir. 1984)).  The United States Supreme Court has cautioned that "not every

8   ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

9   violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly

10   ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the

11   jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502

12   U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  See also United States v.

13   Smith, 520 F.3d 1097, 1102 (9th Cir. 2008).

14         2.   Instruction on Adoptive Admissions

15    Petitioner claims that his right to due process and the privilege against self-

16   incrimination were violated when the trial court gave a jury instruction on adoptive admissions.

17   The California Court of Appeal explained the background to this claim and its ruling thereon as

18   follows:

19         In his next attack on the judgment, defendant contends that "the
           adoptive admissions instruction should not have been given."
20
           The trial court instructed the jury consistent with CALJIC No. 2.71
21         as follows:  "An admission is a statement made by the defendant
           which does not by itself acknowledge the guilt of the crime for
22         which the defendant is on trial, but which statement tends to prove
           his guilt when considered with the rest of the evidence.  [¶]  You
23         are the exclusive judges as to whether the defendant made an
           admission and, if so, whether that statement is true in whole or in
24         part.  You may consider the circumstances under which any
           admissions were made."
25
           Over defense objection, the court also instructed consistent with
26         CALJIC No. 2.71.5, as follows:  "If you should find from the

44

evidence that there was an occasion when the defendant under conditions which reasonably afforded him an opportunity to reply, failed to make a denial or made false, evasive or contradictory statements in the face of an accusation expressly directed to him or in his presence charging him with the crime for which this defendant now is on trial or tending to connect him with its commission and that he heard the accusation and understood its nature, then the circumstances– circumstance of his silence and conduct on that occasion may be considered against him as indicating an admission that the accusation thus made was true.  [¶] Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it.  Unless you find that the defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement.”

Defendant objected to the adoptive admission instruction, claiming that it lacked evidentiary support.  In response, the prosecutor pointed to Raible's testimony.  Raible said she saw defendant and Taylor at Griffith's house the morning after they had left to get Sparks out of her house.  When she saw defendant, she thanked him for getting rid of Sparks.  Defendant responded “[k]ind of with like – kind of like with that gesture of like, kind of silent, but with a gesture of, yeah, okay.”

The prosecutor also suggested that an adoptive admission occurred during defendant's second interview, when he was shown the Department of Justice form “[a]nd at first he just stared and his head went up and down in an affirmative motion.”

Evidence Code section 1221 provides:  “Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.”  In order to find an adoptive admission, the jury is required to make certain preliminary findings, i.e., whether the defendant heard and understood the statement of another; whether the circumstances afforded him an opportunity to reply; and whether, under the circumstances, his statements or conduct manifested an adoption of the truth of the statement.  And where evidence is introduced that may constitute an adoptive admission, the court has a duty to give sua sponte an instruction, such as CALJIC No. 2.71.5, to explain the requisites of an adoptive admission.  (People v. Smith (1986) 187 Cal.App.3d 666, 679-680, 231 Cal.Rptr. 897, disapproved on another ground in People v. Bacigalupo (1991) 1 Cal.4th 103, 126, fn. 4, 2 Cal.Rptr.2d 335, 820 P.2d 559; People v. Vindiola (1979) 96 Cal.App.3d 370, 382, 158 Cal.Rptr. 6.)

/////

45

Defendant claims that Raible's statement to defendant did not accuse him of committing a crime and, thus, cannot constitute the basis for an adoptive admission.  However, to be the basis for an adoptive admission, a statement need not specifically accuse the defendant of a crime; it is sufficient that it tends to connect the defendant with wrongdoing.  (People v. Fauber (1992) 2 Cal.4th 792, 852, 9 Cal.Rptr.2d 24, 831 P.2d 249; People v. Moore (1963) 211 Cal.App.2d 585, 597, 27 Cal.Rptr. 526.)  The evidence established that defendant, Taylor, and Cline left Griffith's house for the purpose of going to Raible's to get Sparks out of there.  That night, Sparks was killed at Raible's house.  Raible's statement the next morning thanking defendant for getting rid of Sparks, and defendant's reaction thereto, constituted a sufficient evidentiary basis for a properly instructed jury to determine whether defendant made an adoptive admission.  (People v. Edelbacher (1989) 47 Cal.3d 983, 1011, 254 Cal.Rptr. 586, 766 P.2d 1; People v. Pitts (1990) 223 Cal.App.3d 606, 850, 273 Cal.Rptr. 757.)  The trial court did not err in instructing on adoptive admissions in this respect.

However, we agree with defendant that his reaction to the Department of Justice report cannot constitute an adoptive admission.  We do so for the fundamental reason that the report was falsified.  The prosecutor stipulated that the report was fabricated by the investigators.  Defendant was permitted to present the testimony of the investigator who created the report.  He said: "It is a prop.  A fake Department of Justice physical evidence examination report that I generated.  I made."  Obviously, a defendant cannot be held to have adopted the truth of a report that everyone, including the jury, knows was fabricated.

However, defendant did not request that the instruction be limited, the prosecutor did not argue that defendant's reaction to the Department of Justice report constituted an adoptive admission, and we can perceive no prejudice from the instruction in this respect.  It informed the jury that, in appropriate circumstances, a defendant's reaction to a statement may be taken as an adoption of the truth of the statement.  There is no reasonable likelihood the jury would apply the instruction where, as here, it is conceded that the initial statement was fabricated.

(Opinion at 22-28.)

a. Petitioner's Reaction to the Fabricated Lab Report

Petitioner first argues that the trial court improperly gave a jury instruction on adoptive admissions because the instruction improperly permitted the jurors to infer guilt from petitioner's silence when he was shown the forged Department of Justice evidence report.  (Pet.

46

1    at 24.)  Petitioner also argues that the instruction allowed the prosecutor to improperly capitalize

2    on the police conduct "previously found to have violated Due Process and shocked the court's

3    conscience."  (Id.)[13]

4           Petitioner cites the decision in Franklin v. Duncan, 884 F. Supp. 1435 (N.D. Cal.

5    1995), affd. 70 F.3d 75, 78 (9th Cir. 1995) in support of his claim.  In Franklin, the defendant

6    invoked his right to silence when questioned by his daughter at the police station.  The trial court

7    gave a jury instruction on adoptive admissions, and the prosecutor argued to the jury at length

8    that petitioner's silence when faced with his daughter's accusations was an admission of guilt.

9    The Ninth Circuit concluded that the jury instruction and closing argument violated petitioner's

10   Fifth Amendment right to remain silent.  Here, in contrast, the prosecutor in his argument to the

11   jury did not equate petitioner's silence in the face of the false lab report with an admission of any

12   kind.  In light of this difference, the decision in Franklin does not dictate the result here.

13          This court agrees with the state appellate court that the giving of an instruction on

14   adoptive admissions was harmless under the circumstances of this case.  The jury was not told

15   that the instruction applied to petitioner's silence in the face of the fabricated lab report and, as

16   noted by the state court, there is no reasonable likelihood the jury would apply the instruction to

17   the petitioner's reaction when confronted with the fabricated lab report where it was conceded

18   that the report was false.   Accordingly, petitioner is not entitled to relief on this claim.

19          b.  Petitioner's Response to Raible's Statement

20          Petitioner also argues that the trial court erred in giving the adoptive admissions

21   jury instruction with respect to "petitioner's shrug in response to Raible's expression of thanks."

22   (Pet. at 26.)  He notes that, under California law, "an adoptive admission requires an adoption of

23

24   _____

   [13]  Petitioner argues that, contrary to the finding of the California Court of Appeal, the
25   prosecutor did argue to the jury that his reaction to the Department of Justice report constituted
   an adoptive admission.  (Id.)  However, the record reflects that the prosecutor made this
26   argument to the trial judge during the jury instruction conference and not to the jury.  (RT at
   1183.)

1  a statement as true," and argues that "a shrug in response to Raible's expression of thanks is [sic]

2  cannot reasonably be viewed as an adoption or admission of anything." (Id. at 26-27.)

3           This court concludes that the giving of the challenged jury instruction did not

4  render petitioner's trial fundamentally unfair, even though petitioner may have responded to

5  Raible's statements with a shrug as opposed to an affirmative statement.  California Evidence

6  Code § 1221 provides that "[e]vidence of a statement offered against a party is not made

7  inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the

8  content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

9  (emphasis added.)  Raible testified that petitioner responded to her expression of thanks for

10  "getting rid" of Sparks with a "gesture" that appeared to mean "yeah, okay." (RT at 553.)  Under

11  these circumstances, it is reasonable for the jury to conclude that petitioner's gesture was an

12  acknowledgment and an admission that he had, in fact, gotten rid of Sparks in some manner.  The

13  giving of the adoptive admission instruction under these circumstances did not violate

14  petitioner's rights under state law or the federal constitution.  Accordingly, petitioner is not

15  entitled to habeas relief with respect to this claim.

16                    3.  Jury Instruction on Voluntary Manslaughter

17           Petitioner's next claim is that the trial court's refusal to give a jury instruction on

18  the lesser offense of voluntary manslaughter violated his right to due process.  (Pet. at 27-29.)

19  The California Court of Appeal rejected this argument, reasoning as follows:

20           Defendant contends the trial court erred in refusing to instruct on
             voluntary manslaughter as a lesser included offense in the charge
21           of murder.  We are not persuaded.

22           A trial court must instruct on a lesser included offense when there
             is substantial evidence that the lesser offense, but not the greater,
23           was committed.  (People v. Hagen (1998) 19 Cal.4th 652, 672, 80
             Cal.Rptr.2d 24, 967 P.2d 563; People v. Birks (1998) 19 Cal.4th
24           108, 118, 77 Cal.Rptr.2d 848, 960 P.2d 1073.)  This means that to
             require instructions on a lesser included offense, there must be
25           evidence which is substantial enough to merit consideration by the
             jury.  (People v. Hagen, supra, 19 Cal.4th at p. 672, 80 Cal.Rptr.2d

26

                                              48

24, 967 P.2d 563; People v. Birks, supra, 19 Cal.4th at p. 118, 77 Cal.Rptr.2d 848, 960 P.2d 1073.)

Murder is committed when one person kills another with malice aforethought. (Pen.Code, §§ 187, 188.) The malice that is an element of murder is express when the killer manifests a deliberate intent to kill unlawfully; it is implied when the killer acts with a conscious disregard for life and with knowledge that his conduct endangers the life of another. (Pen.Code, § 188; People v. Dellinger (1989) 49 Cal.3d 1212, 1215, 264 Cal.Rptr. 841, 783 P.2d 200.) A person who kills in circumstances that would otherwise support a conviction for murder nevertheless acts without malice, and thus is guilty of voluntary manslaughter only, when he kills in a sudden quarrel or heat of passion or does so in the unreasonable but good faith belief that he must act in self-defense. (People v. Rios (2000) 23 Cal.4th 450, 460, 97 Cal.Rptr.2d 512, 2 P.3d 1066; People v. Lasko (2000) 23 Cal.4th 101, 104, 96 Cal.Rptr.2d 441, 999 P.2d 666; People v. Blakeley (2000) 23 Cal.4th 82, 85, 96 Cal.Rptr.2d 451, 999 P.2d 675.)

To negate malice through heat of passion, it must appear that there was adequate provocation by the victim, i.e., the victim engaged in provocative conduct that was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (People v. Lee (1999) 20 Cal.4th 47, 59, 82 Cal.Rptr.2d 625, 971 P.2d 1001; People v. Ogen (1985) 168 Cal.App.3d 611, 621-622, 215 Cal.Rptr. 16.) It also must be shown that the defendant in fact acted in a heat of passion and before the passions of an ordinarily reasonable person would have cooled. (People v. Daniels (1991) 52 Cal.3d 815, 868, 277 Cal.Rptr. 122, 802 P.2d 906.)

To negate malice through so–called imperfect self-defense, it must appear the defendant killed in an actual but unreasonable belief that doing so was necessary to protect himself against imminent peril to life or great bodily injury. (In re Christian S. (1994) 7 Cal.4th 768, 773, 30 Cal.Rptr.2d 33, 872 P.2d 574.) The difference between self-defense, which entirely excuses a killing, and imperfect self-defense, which negates malice but does not otherwise excuse a killing, is the objective reasonableness of the defendant's belief in the need for self-defense. (People v. Flannel (1979) 25 Cal.3d 668, 674-675, 160 Cal.Rptr. 84, 603 P.2d 1.)

To have relevance in a homicide case, the elements of heat of passion and/or imperfect self-defense must be affirmatively demonstrated. (People v. Jackson (1980) 28 Cal.3d 264, 305, 168 Cal.Rptr. 603, 618 P.2d 149, disapproved on another ground in People v. Cromer (2001) 24 Cal.4th 889, 901, fn. 3, 103 Cal.Rptr.2d 23, 15 P.3d 243.) In some cases, the prosecution's own evidence may be sufficient to suggest that the killing was provoked or was in an honest response to a perceived danger. (People v.

Rios, supra, 23 Cal.4th at p. 461, 97 Cal.Rptr.2d 512, 2 P.3d 1066.) But if the prosecution's evidence does not raise these issues, it is the defendant's burden to make some showing sufficient to raise a reasonable doubt. (Id. at pp. 461-462, 97 Cal.Rptr.2d 512, 2 P.3d 1066.) Instructions on heat of passion and/or imperfect self-defense are required only where there is affirmative evidence to support them. (People v. Pride (1992) 3 Cal.4th 195, 250, 10 Cal.Rptr.2d 636, 833 P.2d 643.) Speculation is insufficient. (Ibid.)

Here, we find no evidence in the record that would support a claim that defendant killed the victim in a heat of passion upon adequate provocation or acted in an actual belief that he needed to defend himself against imminent death or great bodily injury.[14] The record includes statements from the three participants in the killing through Cline's testimony, Taylor's statements to Burbank, and defendant's interviews with the investigators. None of these statements suggest provocative or aggressive conduct by the victim before the killing.

The medical evidence showed the victim suffered more than a dozen blows to the face that were probably inflicted by fists, and a blunt– instrument blow to each side of the head sufficient to punch holes in his skull. Defendant claims that this evidence is consistent with a rapid explosion of violence. The medical evidence is, of course, entirely consistent with Cline's testimony about a violent, unprovoked, and rapid assault upon the unprepared victim by defendant and Taylor. It also could be consistent with an explosion of rage. But, without more, the medical evidence does nothing to suggest the killing resulted from adequate provocation by the victim or in defense against the victim's assaultive behavior.

Defendant argues that Lieutenant Compomizzo, who investigated the scene at Raible's house, "was surprised at how little blood he found in the house, because he found substantial evidence of a struggle." In fact, Compomizzo testified that he found substantial quantities of the victim's blood associated with the bed in the master bedroom. He did not find blood from the victim anywhere else in the house. Compomizzo did not testify that he found evidence of a struggle and he did not express surprise that the victim'' blood was restricted to the master bedroom.

---

[14] As a matter of law, the fact that the victim had once been convicted of child molestation does not support instructions on involuntary manslaughter. (People v. Fenenbock (1996) 46 Cal. App. 4th 1688, 1705, 54 Cal. Rptr. 2d 608.) And, although there is no evidence in the record that the victim had an opportunity to attempt to defend himself, efforts of a victim to defend himself against an aggressor cannot constitute either adequate provocation or the basis for an actual belief in the need for self-defense. (In re Christian S., supra, 7 Cal. 4th at p. 773, fn. 1, 30 Cal. Rptr. 2d 33, 872 P.2d 574; People v. Hoover (1930) 107 Cal. App. 635, 639, 290 P. 493.)

1         Compomizzo did describe one evidentiary anomaly in the house.
     He saw what appeared to be fine mist blood splatters on a bi-fold
2         door and rug in the children's bedroom.  While he did not think the
     blood could have been present on the door for years, it could have
3         been there for months.  He sent the door for blood analysis, which
     showed it was not the victim's blood.  He saw nothing to indicate
4         that the blood on the bi-fold door was connected to the homicide in
     the master bedroom and described the matter as odd because it
5         indicated another incident of blood splatter in the house.

6         There is nothing in the record, other than pure speculation, that
     would tend to connect the blood on the bi-fold door with the
7         homicide in the master bedroom.  Moreover, even if we assume
     they are somehow related, there is nothing from that evidence,
8         standing alone, that would suggest adequate provocation by the
     victim or conduct which might have led defendant to believe in the
9         need for self-defense.

10        On this record, defendant's suggestion that the killing might have
     occurred on a sudden quarrel is purely speculative, and the failure
11        to instruct on voluntary manslaughter was not error.  (People v.
     Pride, supra, 3 Cal.4th at p. 250, 10 Cal.Rptr.2d 636, 833 P.2d
12        643.)

13   (Opinion at 27-31.)

14        The United States Supreme Court has held that the failure to instruct on a lesser

15   included offense in a capital case is constitutional error if there was evidence to support the

16   instruction.  See Beck v. Alabama, 447 U.S. 625, 638 (1980).  The Supreme Court has not,

17   however, decided whether this rationale also extends to non-capital cases.  See Turner v.

18   Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182

19   F.3d 677 (9th Cir. 1999).  The Ninth Circuit, like several other federal circuits, has declined to

20   extend Beck to find constitutional error arising from the failure to instruct on a lesser included

21   offense in a non-capital case.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000); Bashor v.

22   Risley, 730 F.2d 1228, 1240 (9th Cir. 1984); see also Valles v. Lynaugh, 835 F.2d 126, 127 (5th

23   Cir. 1988); Trujillo v. Sullivan, 815 F.2d 597, 602 (10th Cir. 1987); Perry v. Smith, 810 F.2d

24   1078, 1080 (11th Cir. 1987).

25        Because petitioner's case was not a capital case, the state trial court's failure to

26   give a lesser included offense instruction does not rise to the level of a constitutional error for

which federal habeas relief is available.  See Turner, 63 F.3d at 819; Windham v. Merkle, 163

F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included

offenses in a non-capital case does not present a federal constitutional question.").  To find a

constitutional right to a lesser-included offense instruction in this non-capital case would require

the application of a new rule of law, which the court may not do in a habeas proceeding.  Teague

v. Lane, 489 U.S. 28 (1989); Solis, 219 F.3d at 929 (habeas relief for failure to instruct on lesser

included offense in non-capital case barred by Teague because it would require the application of

a new constitutional rule); Turner, 63 F.3d at 819 (same).  Under these circumstances, the

decision of the California courts rejecting petitioner's argument in this regard was not contrary to

clearly established federal law.  Accordingly, petitioner is not entitled to relief.

### 4. Jury Instruction on Death Penalty

Petitioner claims that the trial court erred in informing the jurors during voir dire

that the prosecutor was not seeking the death penalty.  The California Court of Appeal rejected

this argument, reasoning as follows:

> The information charged, as a special circumstance, that the
> murder was committed while defendant was engaged in the
> commission of a residential burglary.  (Pen.Code, § 190.2, subd.
> (a)(17)(G).)  However, the prosecution did not intend to seek the
> death penalty.  Before jury selection, the parties discussed whether
> prospective jurors should be told this was not a death penalty case.
> The trial court determined that, in the absence of authority one way
> or the other, it would not so advise the jury unless asked.  The
> court said that, if asked, it would tell the jurors that they would
> have no determination of penalty and that this was not a death
> penalty case.
>
> The scenario described by the court occurred during voir dire.
> When the prosecutor asked whether there was anything that had
> not been discussed that would make anyone uncomfortable in
> sitting on the jury, juror No. 44817 said there would be an issue if
> it was a death penalty case.  The prospective juror expressed
> opposition to the death penalty and a reluctance to serve if that
> were the case.  After a bench conference, the court said: "And my
> response, JUROR NO. 44817, to your question is as follows.  This
> is not a case which can result in imposition of a death penalty.
> Other than that, I must remind you that punishment or penalty must
> not influence or affect in any way the jury's determination on guilt

or innocence.  Jurors are not to consider the issue of punishment or penalty.  It must not enter into juror deliberations at all."  After the presentation of evidence and in closing instructions, the court again instructed the jury that punishment was to have no role in deliberations.

Defendant contends the court committed prejudicial error by telling the jury this was not a death penalty case.  The contention is frivolous.

The purpose of voir dire is to ensure that jurors who serve will be able to fairly and impartially follow the trial court's instructions and evaluate the evidence.  (People v. Earp (1999) 20 Cal.4th 826, 852, 85 Cal.Rptr.2d 857, 978 P.2d 15.)  A prospective juror who states there is a significant likelihood that extraneous matters will enter into the decision making process should not be allowed to serve.  (People v. Hecker (1990) 219 Cal.App.3d 1238, 1245, 268 Cal.Rptr. 884.)  In order to identify such individuals, trial courts are accorded great latitude in conducting voir dire.  (People v. Earp, supra, 20 Cal.4th at p. 852, 85 Cal.Rptr.2d 857, 978 P.2d 15.)

Capital punishment is a sensitive and sometimes contentious issue.  It is accepted that the views some people hold on capital punishment would prevent or substantially impair their performance of the duties of a juror.  (People v. Champion (1995) 9 Cal.4th 879, 908, 39 Cal.Rptr.2d 547, 891 P.2d 93.)  Such persons may be excluded from a trial to determine guilt as well as the penalty phase of a capital trial, should the case get that far.  (People v. Jackson (1996) 13 Cal.4th 1164, 1198-1199, 56 Cal.Rptr.2d 49, 920 P.2d 1254; People v. Wader (1993) 5 Cal.4th 610, 648, 20 Cal.Rptr.2d 788, 854 P.2d 80.)

Obviously, defendant was not entitled to a juror who, thinking this could be a capital case, would be impaired in the performance of the duties of a juror.  (People v. Earp, supra, 20 Cal.4th at p. 852, 85 Cal.Rptr.2d 857, 978 P.2d 15; People v. Hecker, supra, 219 Cal.App.3d at p. 1245, 268 Cal.Rptr. 884.)  When the issue arose, the trial court handled it in a logical and entirely appropriate way by telling the juror this was not a death penalty case, with a strong admonition that the issue of punishment should not be considered in any way.

This procedure was well within the broad discretion of the trial court in conducting voir dire.

(Opinion at 31-33.)

Petitioner argues that the trial judge's response to the juror's question about the death penalty improperly "injected the topic of penalty as a consideration."  (Pet. at 30.)  He

53

1    argues that the instruction caused the jurors to hear the trial evidence "through the tainted filter of

2    that information," and may have led them to take their responsibility as jurors less seriously than

3    they would if petitioner's trial had been a capital case.  (Id.)  Petitioner also argues that the record

4    "supports an inference" that the jury verdict might have been affected by the trial court's

5    instruction because the jurors "apparently believed that this was a close case." (Id. at 29.)  He

6    notes, in this regard, that the jurors deliberated for 17 ½ hours, requested a read-back of

7    testimony, asked several questions indicating they believed petitioner's involvement in the crime

8    may have been limited to disposing of the body and being present in the room where the murder

9    occurred, and ultimately found him guilty of only second degree murder.  (Id.; CT at 648.)

10   Petitioner also argues that since the trial court told the jurors the case did not involve the death

11   penalty, it was unfair not to tell the jurors that the prosecution was seeking a penalty of life

12   without the possibility of parole. (Pet. at 31.)  Petitioner contends that the trial judge's

13   instruction posed an "unjustifiable risk of [juror] bias," in violation of the Sixth Amendment

14   right to an impartial jury. (Id.)  He also argues that the instruction violated his Fourteenth

15   Amendment right to due process because it lightened the prosecutor's burden to prove each

16   element of the crime beyond a reasonable doubt. (Id. at 32.)

17           It is true that the Sixth Amendment right to a jury trial "guarantees to the

18   criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366

19   U.S. 717, 722 (1961).  Due process requires that the defendant be tried by "a jury capable and

20   willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217

21   (1982).  However, there is no evidence in this case that any of the jurors were biased against

22   petitioner or that, because they knew the case did not involve the death penalty, they were

23   unwilling or unable to decide the case based on the evidence introduced at trial.  Petitioner's

24   claim that the verdict may have been influenced by the trial court's answer to the juror's question

25   during voir dire is based on  speculation and should be rejected on that basis.  In addition, the

26   jurors at petitioner's trial were instructed that the subject of penalty should not enter into their

1   deliberations.  (CT at 632.)  Courts "generally presume that jurors follow their instructions."

2   Penry v. Johnson, 532 U.S. 782, 799 (2001).

3          Petitioner's claim that the trial court's advisement violated his right to due process

4   should also be rejected.  The prosecution in a criminal case has the burden of proving each and

5   every element of the crime charged beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364

6   (1970).  However, the trial judge's response to the juror during voir dire did not suggest some

7   lesser burden of proof was born by the prosecution.  There is no evidence that the jurors found

8   against petitioner on any of the elements of the offense simply because this case did not involve

9   the death penalty.  In short, the trial judge accurately responded to a question by one of the jurors

10  and, in doing so, eliminated the possibility that a juror would improperly decide the case based

11  solely on his or her opposition to the death penalty.  The court's response was proper under state

12  law, did not violate petitioner's federal constitutional rights, and did not render petitioner's trial

13  fundamentally unfair.  Accordingly, petitioner is not entitled to habeas relief on this claim.

14              5.  Pinpoint Instructions on Forgery and the Intent to Defraud

15         Petitioner's next claim is that the trial court violated his right to due process when

16  it failed to give "pinpoint" jury instructions to the effect that Detective Hubbard committed

17  forgery and had the intent to defraud when he manufactured the false laboratory report and

18  showed it to petitioner during his interrogation.  The California Court of Appeal rejected this

19  argument, reasoning as follows:

20              Defendant contends the trial court erred in failing to give
             instructions he requested on forgery and the intent to defraud.
21           (CALJIC Nos. 15.00, 15.26.)  He requested the instructions with
             respect to Detective Hubbard's fabrication of a Department of
22           Justice report.  The court declined to give them but said, "[o]f
             course, counsel can make appropriate arguments based upon the
23           evidence."

24              The trial court ruled correctly.  For impeachment purposes, a trial
             court has discretion to admit evidence of conduct that evinces
25           dishonesty or moral turpitude regardless of whether the conduct
             resulted in a criminal conviction.  (People v. Wheeler (1992) 4
26           Cal.4th 284, 288, 14 Cal.Rptr.2d 418, 841 P.2d 938.)  However,

                                         55

1   "[f]rom a logical standpoint, it makes no sense to require the trial
2   court to 'name that crime,' to the exclusion of others, when
    presented with facts of past misconduct.  This not only impinges on
    the prosecution's theoretical discretion to charge offenses, but it is
3   meaningless, since there never will be a conviction for any
    particular offense arising from the conduct . . . .  Whether the trial
4   court admits evidence of past misconduct should be determined
    solely on the basis that that conduct evinces moral turpitude.  The
5   label is not important - the conduct is."  (People v. Lepolo (1997)
    55 Cal.App.4th 85, 89-90, 63 Cal.Rptr.2d 735.)  Defendant was
6   permitted to present evidence of Hubbard's conduct and to make
    arguments based thereon.  That was all to which he was entitled.

7

8   (Opinion at 33-34.)

9          Petitioner argues that by refusing to give instructions on forgery and intent to

10  defraud, the trial court "decided the ultimate issue that Detective Hubbard's use of forgery to

11  seek a confession was not fraud."  (Pet. at 32.)  He argues that the court should have allowed the

12  jury to "make an ultimate factual determination."  (Id.)  Petitioner contends that the trial court's

13  failure to give these requested jury instructions violated his right to "a properly instructed jury,

14  present a defense, the effective assistance of trial counsel, and the Due Process clause of the

15  United States Constitution."  (Id.)  He asserts that, "it is improper to relegate the defense to

16  presenting its legal theories solely in argument without instructions to assist the jurors in

17  evaluating the evidence and argument."  (Id. at 34.)

18         During the jury instruction conference, petitioner's counsel requested that the

19  court instruct the jury with: (1) that portion of CALJIC 2.20 which states that the jury may

20  consider the "past criminal conduct of the witness amounting to a misdemeanor" in determining

21  the believability of a witness; and (2) instructions defining forgery and intent to defraud.  (RT at

22  1180.)  Defense counsel argued that the instructions were relevant because "Detective Hubbard

23  admitted to dummying up a DOJ forensic report, having somebody forge the name of Carmel

24  Suther, a locally well-known DOJ employee, and then using it, which what I would contend

25  would be an intent to defraud my client."  (Id.)  The trial court refused to give the requested

26  instructions, ruling as follows:

1   THE COURT: Okay. In reviewing CALJIC 15.26, the definition
    of intent to defraud, recollecting that the testimony of the witness
2   was the reason for using the document was to obtain the truth,
    recognizing that it could either prompt certain statements that
3   would be incriminatory or exculpatory, using it as a tool to assess
    the credibility of the person he was interviewing, I do not believe it
4   falls within the parameters of the definition of intent to defraud.
    So for that reason, finding the evidence doesn't support a giving of
5   that instruction, I won't give the instruction. Of course, counsel
    can make appropriate arguments based upon the evidence.

6

7   (Id. at 1181-82.)

8          Petitioner has failed to demonstrate that the trial court's failure to give the above

9   described jury instructions as requested violated his federal constitutional rights. As explained

10  by the state appellate court, the trial court's rejection of these instructions was correct under

11  California law. See Mullaney v. Wilbur, 421 U.S. 684, 691 n.11 (1975) (federal courts will not

12  review an interpretation by a state court of its own laws unless that interpretation is clearly

13  untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of

14  rights guaranteed by the Constitution). Moreover, even if the trial court erred as matter of state

15  law in its ruling, "a mere error of state law is not a denial of due process." Rivera v. Illinois, ___

16  U.S. ___, 129 S.Ct. 1446, 1454 (2009) (quoting Engle, 456 U.S. at 121 n.21). The Due Process

17  Clause "safeguards not the meticulous observance of state procedural prescriptions, but 'the

18  fundamental elements of fairness in a criminal trial.'" Id. (quoting Spencer v. Texas, 385 U.S.

19  554, 563-564 (1967)). Petitioner has failed to demonstrate that the failure to give these jury

20  instructions "so infected the entire trial that the resulting conviction violate[d] due process."

21  Estelle, 502 U.S. at 72.

22         Petitioner has also failed to show that the trial court's ruling violated his rights to

23  present a defense or to the effective assistance of counsel. Petitioner's counsel was not prevented

24  from arguing that Detective Hubbard's use of the fraudulent lab report rendered petitioner's

25  subsequent statements involuntary. Accordingly, petitioner is not entitled to relief on these

26  claims.

D. <u>Prosecutorial Misconduct</u>

Petitioner's next claim is that the prosecutor committed misconduct in discussing the meaning of the term "reasonable doubt" during his closing argument to the jury. The California Court of Appeal rejected this argument by petitioner, reasoning as follows:

> Lastly, defendant contends the judgment must be reversed because the prosecutor misstated the burden of proof.
>
> During argument, the prosecutor said: "Now, I'd just like to talk for just a minute or two about reasonable doubt. My burden is to prove the defendant guilty to you beyond a reasonable doubt. And the Judge has already read the jury instruction. It's not a mere possible doubt, because everything related to human affairs is subjected to some possible or imaginary doubt. You know, what does that really mean in layman's language? You know, what is beyond a reasonable doubt? And this is an important concept, because you can't find the defendant guilty unless you are convinced I've proven him guilty beyond a reasonable doubt. [¶] So I want to give you my interpretation of reasonable doubt. And I want you to look at it. Reasonable doubt has to be a doubt with a reason. You have to be able to say, I don't think the defendant's guilty because-because I don't believe anything Carla Cline said. Or because I don't believe Fran Evans' analysis. Or because of this. It can't just be, you know, I have a reasonable doubt as to the defendant's guilt. You know, just something doesn't seem right. Or, you know, there's something there that's missing, but I don't know what it is. There has got to be a doubt you can articulate. You have to be able to say that I have a reasonable doubt as to the defendant's guilt and that doubt is this and because of this I can't find him guilty."
>
> Defense counsel objected, and the trial court said: "Well, I will just remind the jury that this is argument and what the lawyers say is not to be taken as the law. The law is what I read to you in the instructions that you get. And you may find some differences between what the lawyer describes to you as their understanding and what the law is and what your understanding is."
>
> When the prosecutor returned to his argument, he also told the jury that the law is what is in the jury instruction and not in his argument. He said he was just trying to give an example of how he would like the jury to look at it. He said there is no fixed level at which beyond a reasonable doubt is reached. You know, it's - it's really the state of your own mind at the end of all the evidence."
>
> Penal Code section 1096 provides: "Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary

doubt.  It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.'"

Reasonable doubt, as the term implies, must be founded in reason and not mere speculation or imagination.  To the extent this was the point of the prosecutor's comments, it was not improper.  But reasonable doubt does not require the jurors to articulate a specific reason for their doubt.  It is enough that, upon consideration of all of the evidence, they are not sufficiently convinced of the defendant's guilt.  To the extent the prosecutor suggested the jury must articulate a reason for their doubt, the argument was incorrect.  (See People v. Hill (1998) 17 Cal.4th 800, 831-832, 72 Cal.Rptr.2d 656, 952 P.2d 673.)

"In evaluating a claim of prejudicial misconduct based upon a prosecutor's comments to the jury, we decide whether there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner."  (People v. Cunningham (2001) 25 Cal.4th 926, 1019, 108 Cal.Rptr.2d 291, 25 P.3d 519.)  In doing so, we consider the context in which the statements were made, instructions given the jury by the trial court, and any steps that were taken to cure the error.  (People v. Bell (1989) 49 Cal.3d 502, 540, 262 Cal.Rptr. 1, 778 P.2d 129; People v. Nguyen (1995) 40 Cal.App.4th 28, 36-37, 46 Cal.Rptr.2d 840.)

The trial court instructed the jury:  "You must accept and follow the law as I state it to you, regardless of whether you agree with the law.  If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions."  The court instructed the jury on reasonable doubt in the precise language of Penal Code section 1096.  And the jury was provided with a written copy of the instruction for use during deliberations.

When, during argument, the prosecutor suggested that the jury must be able to articulate a reason for a doubt, the trial court admonished the jurors that they must follow the jury instructions and not the arguments of counsel.  The prosecutor promptly agreed.  He abandoned the articulated-reason argument and correctly informed the jury that "it's really the state of your own mind at the end of all the evidence."

Hence, we perceive no reasonable possibility that the jury convicted defendant despite a reasonable doubt and simply because it could not articulate a reason for such a doubt.  In short, there is no reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner.  (People v.

/////

1          Cunningham, supra, 25 Cal.4th at p. 1019, 108 Cal.Rptr.2d 291, 25
           P.3d 519.)

2

3      (Opinion at 34-38.)

4          A criminal defendant's due process rights are violated when a prosecutor's

5      misconduct renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181

6      (1986).  However, such misconduct does not, per se, violate a petitioner's constitutional rights.

7      Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181, and

8      Campbell v. Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Claims of prosecutorial

9      misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether

10     the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction

11     a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation

12     omitted).  See also Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416

13     U.S. 637, 643 (1974); Turner v Calderon, 281 F.3d 851, 868 (9th Cir. 2002).  Relief on such

14     claims is limited to cases in which the petitioner can establish that prosecutorial misconduct

15     resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at 637-38); see also

16     Darden, 477 U.S. at 181-83; Turner, 281 F.3d at 868.  Put another way, prosecutorial misconduct

17     violates due process when it has a substantial and injurious effect or influence in determining the

18     jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).  Finally, it is the

19     petitioner's burden to state facts that point to a real possibility of constitutional error in this

20     regard.  See O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990).

21         In considering claims of prosecutorial misconduct involving allegations of

22     improper argument the court is to examine the likely effect of the statements in the context in

23     which they were made and determine whether the comments so infected the trial with unfairness

24     as to render the resulting conviction a denial of due process.  Turner, 281 F.3d at 868; Sandoval

25     v. Calderon, 241 F.3d 765, 778 (9th Cir. 2001); see also Donnelly, 416 U.S. at 643; Darden, 477

26     U.S. at 181-83.  Thus, in order to determine whether a prosecutor engaged in misconduct in

60

closing argument, it is necessary to examine the entire proceedings to place the remarks in context.  See United States v. Robinson, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment must be examined in context . . . ."); Greer, 483 U.S. at 765-66; Williams v. Borg, 139 F.3d 737, 745 (9th Cir. 1998).

This court concludes that the prosecutor's comments during his closing argument about reasonable doubt did not violate petitioner's rights to due process or a jury trial.  As discussed by the state appellate court, the jury was correctly instructed by the court as to the definition of reasonable doubt.  The prosecutor abandoned his improper argument after the trial judge admonished the jury to follow the jury instructions given by the court and not the arguments of counsel.  "The jury is regularly presumed to accept the law as stated by the court, not as stated by counsel." United States v. Rodrigues, 159 F.3d 439, 451 (9th Cir. 1998). See also United States v. Medina Casteneda,, 511 F.3d 1246, 1249-50 (9th Cir. 2008) (misstatement of the reasonable doubt standard by the prosecutor in closing argument did not entitle defendant to reversal of his conviction because the jury instructions properly defined the beyond a reasonable doubt standard).  Moreover, misstatements of the law by prosecutors in closing argument "are not to be judged as having the same force as an instruction from the court." Allen v. Woodford, 395 F.3d 979, 1010 (9th Cir. 2005) (quoting Boyde, 494 U.S. at 384-85).  Under the circumstances presented here, the state appellate court's conclusion that the prosecutor did not commit misconduct during closing argument is not contrary to or an unreasonable application of federal law.  Accordingly, petitioner is not entitled to relief on this claim.

E. Failure of the California Court of Appeal to Address Issues

Petitioner's final claim is that the California Court of Appeal improperly refused to address several of his arguments raised on appeal, in violation of his rights to due process and appellate review.  (Pet. at 35-37.)  Specifically, petitioner asserts that the state appellate court "made only passing reference" to his claim regarding the admissibility of Taylor's statements to Burbank, "failed to address" his claim of outrageous government conduct, and "failed to squarely

1   address" his argument that an adoptive admission requires an adoption of a true statement.  (Id. at

2   36.)

3          Assuming arguendo that the California Court of Appeal failed to fully address

4   each of petitioner's arguments on appeal, such an allegation fail to state a cognizable claim for

5   federal habeas relief.  In this regard, petitioner's claim is based upon the alleged violation of state

6   law and is not cognizable in this federal habeas proceeding.  Ortiz v. Stewart, 149 F.3d 923, 939

7   (9th Cir. 1998); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997);  Franzen v. Brinkman,

8   877 F.2d 26 (9th Cir. 1989) (alleged errors in a state post-conviction review proceeding are not

9   addressable through federal habeas corpus).  Accordingly, petitioner is not entitled to federal

10  habeas relief on this claim.

11                                  CONCLUSION

12         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

13  a writ of habeas corpus be denied.

14         These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

16  days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within ten days after service of the objections.  The parties are advised

20  that failure to file objections within the specified time may waive the right to appeal the District

21  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED: June 17, 2009.

24  _____

    DALE A. DROZD
25  UNITED STATES MAGISTRATE JUDGE

26  DAD:8
    sutherland532.hc

62